351 F.2d 183
 UNITED INDUSTRIAL WORKERS OF the SEAFARERS INTERNATIONAL
UNION OF NORTH AMERICA, GULF, LAKES AND INLAND
WATERS DISTRICT, MARINE ALLIED WORKERS
DIVISION, AFL-CIO, Appellant,
v.
BOARD OF TRUSTEES OF the GALVESTON WHARVES et la., Appellees.
 No. 21945.
 United States Court of Appeals Fifth Circuit.
 Sept. 14, 1965, Rehearing Denied Dec. 2, 1965.
 
 Newton b. Schwartz, Houston, Tex., C. Paul Barker, New Orleans, La., for appellant.
 V. W. McLeod, Galveston, Tex., for appellees.
 Before BROWN and BELL, Circuit Judges, and HUNTER, District Judge.
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 The major problem in this appeal from a denial of a preliminary injunction is whether the controversy between the Union[1] and the Carrier[2] is a minor dispute under the Railway Labor Act. Scarcely concealed behind the facade of this misnamed major-minor figure, is the basic question whether a carrier, after a timely demand for bargaining, has to bargain before it may put into effect during the term of the collective bargaining agreement a non-discriminatorily motivated lease of its jurisdictional facilities which effectually suspends all such operations of the carrier and the need for operational employees. In answering this, we conclude that what the District Judge thought to be minor was actually a major dispute. We therefore reverse and remand.
 
 
 2
 As is so often true in these majorminor situations, the facts are simple, neither complex nor conflicting.
 
 
 3
 The Carrier, Galveston Wharves, the owner and operator of the extensive dock facilities of the Port of Galveston, Texas, has for some activities the status of a carrier by railroad under the Interstate Commerce Act. Among these facilities is Elevator B, a large shipside public grain elevator which it has for many years owned and operated. Presumably because these constitute transportation facilities,[3] 49 U.S.C.A. 1(1) and (3), the Wharf Company as to them is considered to be a common carrier by rail under the Interstate Commerce Act, 49 U.S.C.A. 1 et seq., and this brings into play the Railway Labor Act, 45 U.S.C.A. 151 et seq.[4] Pursuant to the Act, the National Mediation Board, see 154-155, on August 24, 1960, certified the Union as the collective bargaining agent for all elevator employees employed by Carrier, its 'successors and assigns.'
 
 
 4
 The collective bargaining Agreement[5] currently in force when the actions here scrutinized took place was, by its terms, effective as of October 1, 1960. It prescribed that it was to 'remain in effect until' September 30, 1963,[6] but actually it was a 'continuous unless' term.[7] No 60-day termination notice was given in 1963. On the contrary, presumably acting under the proviso (note 7, supra), the parties stipulated in September 1963 that the Agreement 'is extended for a one-year period * * * through' September 30, 1964.
 
 
 5
 On July 20, 1964, as permitted under the Agreement, the Union served formal opener notice on the Carrier that it wished to open the existing contract for negotiation. Thereafter, on July 23, the Carrier advised the Union, presumably for the first time officially at least, that it would not negotiate[8] presumably because it had leased Elevator B to Port Richmond Elevator Co., Inc.[9] On the same date, the Carrier posted a notice at Elevator B that all of the employees would be permanently laid off effective midnight July 31, 1964, presumably as a result of the lease.[10] On July 29 the Union served what it now describes as a 'section 6' notice requesting negotiation of all matters affecting wages, hours, and working conditions covered by the existing contract and particularly a clause covering shut-down, leasing, or subcontracting.[11] The Carrier declined, replying that 'It is not possible to reopen the contract under the present conditions.' Representatives of Carrier and Union thereafter conferred in several sessions, the first on July 31, the last on August 13, but apparently to no avail.[12] The Union commenced a strike on July 31, 1964.[13]
 
 
 6
 On July 31, 1964, the Union instituted this action against the Carrier and Lessee. Invoking the Railway Labor Act,[14] it sought, in effect, an injunction against the consummation of the lease or operation under it pending exhaustion of the Railway Labor Act machinery, and also a restoration of the prior status quo. The complaint, setting out the facts briefly summarized here, asserts specifically that the Carrier failed to give the requisite 30 days' notice of proposed changes in violation of 6[15] (and 2, subd. 7)[16] of the Act, 45 U.S.C.A. 156 and 152 Seventh.
 
 
 7
 After earlier denying an ex parte application for temporary restraining order, the District Court, after a hearing apparently all on affidavits and documents, denied the application for preliminary injunction and this appeal followed. 28 U.S.C.A. 1292(a)(1).
 
 
 8
 It rounds out this factual summary to state that the Carrier relied on two provisions of the Agreement, the '7-day clause'[17] and the 'management rights clause'[18] as the basis for its contention that its actions were sufficiently permitted under the Agreement as to classify the controversy as a grievance for determination by the Railway Adjustment Board.
 
 
 9
 Before getting into the more troublesome areas as between Union and Carrier, we can quickly dispose of the appeal as to the Lessee Port Richmond.
 
 
 10
 In a nutshell the Union argues two things. The first is that the representation certificate of the NMB expressly prescribes that the Union is the bargaining representative for the specified 'employees of the Galveston Wharves, its successors and assigns.' The second is that under contemporary labor law developments, successors are frequently being held to the obligations of their predecessors.
 
 
 11
 As to the second contention, we would certainly acknowledge that the signs point plainly in the direction of imposing either direct liability or at least the duty to bargain on successors.[19] But the very reason which makes the first contention untenable likewise makes it unnecessary for us to analyze the second. As to each, there is a missing link. This serves to emphasize that even though, as we later hold, operation of the Railway Labor Act does subject the Carrier here to immediate obligations because it has made a lease of limited duration, it does not necessarily follow that Port Richmond, the Lessee, inherits them. The lessee does so only if it too is a carrier under the Act.
 
 
 12
 Port Richmond, wholly owned as it is by Bunge Corp., likewise unrelated to Carrier, did not require ICC approval for the lease. 49 U.S.C.A. 5(1). Leasing the facilities did not, therefore, cause it to become a carrier even under the broad sweep of 49 U.S.C.A. 1 (note 3, supra). And completely independent of Carrier here, it did not become one under the Railway Labor Act, 1 First, which extends the carrier definition to persons operating 'any * * * facilities in connection with * * * elevation * * * storage * * * of property' if such party is 'directly or indirectly owned or controlled by' a carrier by railroad. 45 U.S.C.A. 151 First (see note 4, supra).
 
 
 13
 Of course it is not a matter of the employer's choice. If a 'carrier,' the Railway Labor Act applies. If not a carrier, then LMRA applies. 29 U.S.C.A. 152(2)(3). Consequently, giving full recognition to the NMB 'successors and assigns' certificate, cf. Switchmen's Union of North Amer. v. National Mediation Board, 1943, 320 U.S. 297, 64 S.Ct. 95, 88 L.Ed. 61, it turns out to be irrelevant, cf. Regal Knitwear Co. v. NLRB, 1945, 324 U.S. 9, 65 S.Ct. 478, 89 L.Ed. 661. No matter what it would like to do, Port Richmond must comply with LMRA and except for some rare situations, e.g., 10(l), see note 10, supra, the Union's redress must be sought and obtained initially from the National Labor Relations Board.
 
 
 14
 This brings us to the more troublesome problem of the case as between Carrier and Union. The Trial Judge's memorandum opinion indicates that in denying relief, he did two things. First, apparently thinking that the change was not to be a change of the agreement itself and there was some basis for the Carrier's action under the '7-day' and 'management rights' clauses (notes 17 and 18, supra), he held this was a minor dispute for resolution by the Railroad Adjustment Board.[20] Second, he concluded that equitable considerations did not reasonably require the granting of permissive injunctive relief to preserve the status quo pending decision by the Adjustment Board.
 
 
 15
 When the actions of the Carrier are carefully analyzed, we think it is clear that this was not a minor dispute. It was major both in fact and in law.
 
 
 16
 At the outset several things may be briefly emphasized. The first is, of course, that if by its terms of reasonable implication therefrom, the collective agreement apparently affords some arguable basis for the action, the interpretation of the contract, the question of who is right-- Carrier or Union-- is for determination by the Railroad Adjustment Board,[21] a Court having jurisdiction only to mold equitable relief to preserve the status quo pending Adjustment Board decision.[22] The result ordinarily is that unless the proposed change is to be reflected in a change in the agreement, it is not a 6 situation and remains a minor dispute.[23] But this is to be tested as a matter of substance since a carrier in imposing changes in nowise contemplated or arguably covered by the agreement is not to escape the impact of the Act merely through the device of unilateral action which it purposefully intends is not to become a part of the written agreement.[24] This follows from the force of 2 Seventh (see note 16, supra) and the law's refusal to determine 'major' or 'minor' by the labels affixed by the interested combatants through artfully contrived formalistic demands or responses.[25]
 
 
 17
 When we look at the sharp outlines of this case through ordinary glasses, not major or minor lenses, we can see this case for what it really is: during the term of the contract, the Carrier terminated the contract by going out of business. But it had no right to terminate the contract prior to its expiration. And the action effectually extinguished the relationship of employer and employee, carrier and union.
 
 
 18
 Without trespassing on the exclusive domain of the Adjustment Board (see note 21, supra), it is plain that this action was not, and cannot even remotely be justified as a 'lay off' (see note 17, supra) nor as the exercise of managerial prerogative (see note 18, supra). Broad as is the management prerogative clause there is absolutely nothing about the Agreement, or more fundamentally, about the nature of the relationship and the peculiar role of collective bargaining agreements in assuring industrial peace, which contemplates that during the term the employer has the right to bring it all to an end simply by ceasing operations.
 
 
 19
 Nothing in this record even remotely suggests that this was a temporary layoff of all due to lack of work, retooling, periodic overhaul, change in the method of operation, or the like. This was it-- final, positive, all washed up. The Carrier made that clear by posting what it euphemistically calls its 'layoff notice' which advised the employees of the 'termination of our operation of the elevator at the close of business of July 31.' And then by language which must be rare indeed in the contemporary history of railroad labor relations, the Carrier announced the flat position 'we will not be meeting with you in connection with the contract termination' (see note 8, supra).
 
 
 20
 Up to this moment a contract existed between Carrier and Union. Under that contract the elevator was to be operated by the Carrier, the work to be performed by members of this Union. In the language of 2 Seventh (note 16, supra), this was the very essence of the arrangement 'embodied in' the Agreement on 'rates of pay, rules, or working conditions.' Now all was being changed. But the Carrier can point to no provision of the contract giving it the contract right to make this decisive change. We may assume that an employer has the legal right to go out of business. But under the Railway Labor Act when he does so during the term of the agreement, it is such a change in 'working conditions' that under 6 and 2 Seventh, he must give notice. By the simple language of 2 Seventh, the procedure of 6 (see note 15, supra) was set in train. There is no pretense that 6 was complied with. Under those circumstances the Union, and perhaps the National sovereign, became entitled to effective judicial relief to assure fulfillment of this national labor policy. Florida East Coast Ry. v. Board of Railroad Trainmen, 5 Cir., 1964, 336 F.2d 172; Florida East Coast Railway Co. v. United States, 5 Cir., 1965, 348 F.2d 682 (No. 22134, July 21, 1965).
 
 
 21
 If the Carrier's response to this is that the collective Agreement was not terminated, only its physical elevator operations, its predicament is even more defenseless. For on this hypothesis, the contract was still in effect. By its terms, it was to continue to run 'from year to year * * * unless written notice was given at least sixty (60) days prior' to the termination date (see note 7, supra). The Carrier had not undertaken to give any such categorical notice. Assuming that its letter response of July 23 (note 8, supra) was intended as such a notice, the contract still remained in effect for a period at least up to September 30, 1964, and probably for a minimum of 30 days thereafter[26] The contract clearly gave the Union the right to file both its opener of July 20 (note 6, supra) and its 6 demand of July 29 (note 11, supra). By this time the handwriting was indeed on the wall-- on the wall of the bulletin board advising the Union members that on midnight July 31, they would be out of a job they had held, some, for many years.
 
 
 22
 This was taking place during the existence of the contract. This was, as we shall later point out, obviously a change in 'working conditions.' If-- and there is no if at all about it-- the Carrier had first the obligation to give a 6 notice before instituting the change during the contract term, then all the more did the Union have a right to bargain. The 6 notice was appropriate and was in no sense a verbal formalism confected to give the appearance of a legal right not available. (see note 25, supra) Whether the Union would be able to obtain any relief, whether is economic power vis-a-vis the Carrier would or would not result in any advantage, the Union through the 6 notice had the clear right to demand that the Carrier comply with the emphatic demand of 2 First and Second (see note 14, supra). As the announced action most assuredly was a change in 'working conditions', the fact that the Union's 6 notice came after the event is of no moment. The die had been cast but the Carrier could retrieve it. Nor does it detract from the Union's right to talk-- at least talk-- about a matter so vital to the welfare of its membership that the occasion for a legally peremptory demand was a violation by the Carrier of its own duties.
 
 
 23
 But all doubt has, we think, been removed by the Suprme Court's action in Fibreboard Paper Products Corp. v. NLRB, 1964, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, especially as it relies on the Telegraphers[27] case.
 
 
 24
 In Telegraphers, the Court upheld the union's right to a 6 demand for bargaining as to extensive system-wide abolition of certain positions. The Court pointed out that what carriers must legally bargain about is affected by what is in fact bargained about in the railroad world. (362 U.S. 330, 337-338, 80 S.Ct. 761, 767, 4 L.Ed.2d 774.) And to the contention that the 'layoffs' from station abandonments were a minor dispute, the Court was emphatic. 'It is impossible to classify as a minor dispute this dispute relating to a major change, affecting jobs, in an existing collective bargaining agreement, rather than to mere infractions or interpretations of the provisions of that agreement.'
 
 
 25
 And in Fibreboard all question is removed whether total displacement of a labor force-- there by contracting out, here by withdrawal from business for a time-- is a change in 'working conditions.' By direct citation to Telegraphers, it equates this Railway Labor Act term with 'terms and conditions of employment' as used in LMRA, 29 U.S.C.A. 158(a)(5). More than that it recognizes that employees, the most immediately affected group, ordinarily should have a right at least to talk before the deed is done.
 
 
 26
 'The subject matter of the present dispute is well within the literal meaning of the phrase 'terms and conditions of employment.' See Order of Railroad Telegraphers v. Chicago & N.W.R. Co., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774. A stipulation with respect to the contracting out of work performed by members of the bargaining unit might appropriately be called a 'condition of employment.' The words even more plainly cover termination of employment which, as the facts of this case indicate, necessarily results from the contracting out of work performed by members of the established bargaining unit.' 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 238.
 
 
 27
 That is Fibreboard the Court, especially in the concurring opinion, is conscious that there may be total displacements left solely to managerial decision unaffected by collective bargaining is neither surprising or decisive here. Nor for that matter is its parallel decision in Textile Workers Union of Amer. v. Darlington Mfg. Co.; National Labor Relations Board v. Darlington Mfg. Co., 1965, 380 U.S. 263 85 S.Ct. 994, 13 L.Ed.2d 827. There may well be an absolute legal right to go out of business when not done with anti-union purpose.[28] But the Carrier did not go out of business. Its lease, as leases of large industrial properties go, is short termed indeed. And in many ways it appears to have many of its former owner-operator burdens and obligations.
 
 
 28
 More than that, the very snarl these employees are in (see note 9, supra) shows why an employer subject to the Railway Labor Act may have special obligations in pretermination bargaining. Suddenly from an action which is entirely legitimate and undoubtedly sound from an economic standpoint, employees of long standing find themselves with neither job nor representation continuity. In no small measure this is due to the mutual-exclusiveness of LMRA and Railway Labor Act. Surely through bargaining a way might be found to accommodate two congressional Acts, a single business operation and a labor force whose loyalty or competence has not here been criticized in the least.
 
 
 29
 That means we must reverse and remand. We think we need not direct that the lease be unscrambled at this time. But these employees' rights having been so clearly violated, some suitable relief and sanction should be imposed[29] so that bargaining about this operational termination, now so long delayed, may go forward. We do not blueprint these matters. They are best left to the discretion of the District Judge.
 
 
 30
 Reversed and remanded.
 
 
 31
 BELL, Circuit Judge (concurring in part and dissenting in part):
 
 
 32
 I concur in the opinion of the court to the extent that it affirms the District Court in denying relief against Port Richmond Elevator Co., Inc., the lessee. I respectfully dissent from the holding as it relates to Galveston Wharves.
 
 
 33
 The District Court, in denying relief, was of the view that only a minor dispute was involved and that under the Railway Labor Act the court was without jurisdiction. Order of Railway Conductors v. Pitney, 1946, 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318; Slocum v. Delaware, L. & W.R. Co., 1950, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795; 45 U.S.C.A. 153. Our recent case of St. Louis, San Francisco & Texas Ry. Co. v. Railroad Yardmasters of America, 5 Cir., 1964, 328 F.2d 749, was deemed to be controlling. I agree.
 
 
 34
 The majority speaks in terms of bargaining over whether the elevator is to be leased, and of perhaps unscrambling the lease. This is drastic relief indeed, and presumably it has not been lightly granted. My difference is that I have looked in vain for some foundation for the holding. This follows in part at least from the fact that I take a much less expansive view of the problem presented.
 
 
 35
 The fact that employees lost their positions is no doubt of major consequence to them but this is far different from a major dispute within the context of the Railway Labor Act. The carrier contended that only a minor dispute was involved. It was operating under an agreement with the union which provided that it could lay off employees on seven days' notice, and which reserved to the carrier broad management prerogatives which may be said to embrace its decision to lease the elevator. See Articles XVI and XII, Footnotes 17 and 18, majority opinion.
 
 
 36
 The dispute necessarily turns on a construction of these provisions to determine whether the carrier acted within its rights. This is a classic example of a minor dispute which under the law is to a cessation of business question instead Board. See 3, First (i) of the Railway Labor Act, 45 U.S.C.A. 153, First (i), which provides that disputes between a carrier and its employees 'growing out of * * * the interpretation or application of agreements concerning rates of pay, rules, or working conditions * * * may be referred * * * by either party to the * * * Adjustment Board.' See Order of Conductors v. Pitney, supra, and Slocum v. Delaware, L. & W. R. Co., supra, to the effect that such disputes are not for the courts. Minor disputes under the Railway Labor Act which, as stated, involve questions of of anti-union animus. Darlington makes bargaining agreement are to be distinguished from major disputes. This latter type are those arising from efforts to change working conditions through the making of a new agreement. They involve the creation of new rights rather than the enforcement of existing contractual rights. Major disputes go eventually to mediation in an effort to avoid a strike. 6 of the Act, 45 U.S.C.A. 156, which the majority states has been violated by the carrier here is a part of the major disputes settlement machinery. 6 of the Act, even if the dispute is 1945, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886, 1894-1895. See also Brotherhood of L. F. and E. v. Florida East Coast Ry. Co., 5 Cir., 1965, 346 F.2d 673, on the difference between major and minor disputes.
 
 
 37
 Certainly the carrier may argue in Francisco & Texas Ry. Co. v. Railroad and management prerogative provisions of the agreement. This is all that is necessary to leave the question to the Adjustment Board and it is for that tribunal to construe it. St. Louis, S.F. & T. Ry. Co. v. Railroad Yardmasters of America, supra.
 
 
 38
 The majority puts aside the minor dispute contention, apparently because jobs were terminated; and takes the position that a major dispute over the right to lease-- something outside the contract-- is involved. This is said to bring 6 of the Act into play, and the carrier in violation because it has not followed 6. The correctness of this position, of course, turns on whether the dispute is major or minor and, as stated, I think it is minor.
 
 
 39
 I could not concur even if a major dispute were presented absent a determination that the lease in question did not amount to a bona fide termination of elevator operations by the carrier. The majority leans on Fibreboard Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233, a case concerned with the duty under the National Labor Relations Act to bargain over terms or conditions of employment. 29 U.S.C.A. 158(a)(3) and (5). There the court relied on its prior decision of Order of Railroad Telegraphers v. Chicago & N.W.R. Co., 1960, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774, to sustain the proposition that the contracting out of work was a condition of employment over which bargaining was mandatory. The subject matter for mandatory bargaining under 6 of the Railway Labor Act in the Telegraphers case was an amendment to the existing labor agreement offered by the union that no existing jobs would be abolished except by agreement. The carrier was in the process of closing some of its stations with the result that jobs would be lost.
 
 
 40
 The union here seeks to bargain over what may be argued is an amendment similar in result, the right to lease the elevator. However, I would distinguish the Telegraphers case on the ground that the carrier there did not propose discontinuing some definite phase of its operations as a carrier such as a branch line or the like. If the carrier here ceased its elevator operations through the medium of a bona fide lease, and this is a matter for the District Court to first determine, then I think the Telegraphers case would not obtain for the reason that a cessation of employment question is of a condition of employment question is presented. I would answer that question in favor of the carrier on the authority of the gloss put on 6 of the Railway Labor Act by the Textile Workers of America v. Darlington Manufacturing Co., 1965, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827, which removes cessation of business questions from the realm of mandatory bargaining. Fibreboard involved the contracting out of work, activity also different from discontinuing a business.
 
 
 41
 There is not a whisper in the record of the elevator having been leased because o anti-union animus. Darlington makes it clear that management has the absolute right to go out of business even for anti-union purposes where the whole business is closed. Here Galveston Wharves leased only a part of its business. It retained its switching operation. Darlington holds that an employer has the right to close a part of its business so long as there is no showing that the closing was for anti-union purposes. The employer would however, be bound for the balance of the period of any existing contract in such event, here two months. Hence, 6 of the Act, even of if the dispute is major in light of the Telegraphers case, might nevertheless be inapplicable depending on the facts regarding whether there was a bona fide cessation of the elevator business by the carrier.
 
 
 42
 Being unable to distinguish the rationale of our own case of St. Louis, San Franciso & Texas Ry. Co. v. Railroad Yardmasters of America, supra, I would affirm.
 
 
 43
 Rehearing denied; BELL, Circuit Judge, dissenting.
 
 
 
 [1]
 United Industrial Works of the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, Marine Allied Workers Division, AFL-CIO
 
 
 [2]
 The Galveston Wharves, a facility owned by the City of Galveston, Texas, and operated for it by the Board of Trustees
 
 
 [3]
 See 49 U.S.C.A. 1(1) and (3). 1(1) extends the Act to '(a) the transportation of * * * property wholly by railroad * * *.' This is amplified. See 1(3)(a): 'The term 'common carrier' * * * shall include * * * all persons, natural or artificial, engaged in such transportation as aforesaid as common carriers for hire. * * * The term 'railroad' * * * shall include all bridges, * * * used by or operated in connection with any railroad * * * and also all switches, spurs, tracks, terminals, and terminal facilities of every kind used or necessary in the transportation of the * * * property including all freight depots, yards, * * * used or necessary in the transportation * * * of * * * such property. * * * The term 'transportation' * * * shall include locomotives, cars * * * and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract * * * for the use thereof, and all services in connection with the receipt, delivery, elevation, and transfer in transit * * * storage, and handling of property transported.'
 
 
 [4]
 Railway Labor Act, 45 U.S.C.A. 151:
 'First. The term 'carrier' includes and * * * carrier by railroad, subject to the Interstate Commerce Act, and any company which is directly or indirectly owned or controlled by or under common control with any carrier by railroad and which operates any equipment or facilities or performs any service (other than trucking service) in connection with the transportation, receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, and handling of property transported by railroad * * *'
 'Fifth. The term 'employee' as used herein includes every person in the service of a carrier * * *.'
 
 
 [5]
 The contract prescribed that it is binding on the Carrier and its 'successors.' At the time of the lease, 34 employees, many of long service, were covered
 
 
 [6]
 There was a limited reopener right as to wages only on October 1, 1961, and on 60 days' notice October 1, 1962
 
 
 [7]
 Art. I provided that 'This agreement shall continue in effect from year to year following October 1, 1963, unless written notice shall be given at least sixty (60) days prior to the first day of October 1963 and provided further, the parties may mutually agree in writing for an extension of the agreement to avoid such termination.'
 
 
 [8]
 The letter, July 23, from Carrier to Union stated: 'Effective today we are posting layoff notices on the bulletin board at Elevator 'B' for all Elevator personnel advising termination of our operation of the Elevator at the close of business on July 31st. Therefore, we will not be meeting with you in connection with the contract termination.'
 
 
 [9]
 Port Richmond (also a defendant-appellee here) is wholly unrelated to the Carrier. On complaint filed by it under LMRA, 29 U.S.C.A. 160(l), the Regional Director, NLRB, sought and obtained a 10(l) injunction prohibiting members of the Union from recognition-picketing of the premises pending determination by the Board of the 8(b)(7)(C) unfair labor practice charge against the Union. Clifford W. Potter, Regional Director, NLRB v. United Industrial Workers of the Seafarers International Union of North America, et al., Civil No. 64-G-88, S.D.Tex., Galveston Div. Under the practice followed by this Court (See Rules 23(1) 23(a), 1 and 9 et seq.), we had this file brought up to consider as a part of the instant record
 
 
 [10]
 The lease was for a term of 5 years and, dependent upon satisfying specific minimum grain movement volumes, Lessee had option for a 5-year renewal with first option rights to negotiate for successive renewals. Rental was on per bushel of grain moved with 5-year minimum of $1,250,000. The Carrier had substantial obligations for maintenance, repair, and replacement of property and machinery
 This skimpy record does not show whether any of the repair, maintenance, replacement obligations of Lessor-Carrier would customarily have been performed by members of the Union certified by the NMB as representative of Carrier's 'Elevator Workers and Maintenance Employees.'
 
 
 [11]
 The notice requested '* * * specifically that the contract shall include a clause which in essence shall require that before the carrier shall lease, or otherwise relinquish operations of the elevavator presently staffed and manned by the employees we represent it shall consult with the obtain the agreement of the certified representative of the aforesaid employees.'
 
 
 [12]
 The Carrier's brief implies that the Union's conduct in submitting 'minor' grievances demonstrates the lack of a 'major' dispute. From it we get this information. Subsequent to the July 29 6 demand the Union apparently submitted grievances for disposition under the grievance machinery of the agreement. Carrier conferred with Union on July 31 at which time Union merely presented a list of grievances for recognition of new elevator operators, payment of 1965 vacation pay, July 4th holiday pay, and accumulated sick leave. On August 1, Carrier was notified Union was initiating grievance machinery arbitration as to the men laid off. The parties met August 3 at which time Union merely re-urged grievances discussed July 31. There was no discussion by either party of proposed contract changes. On August 4, Carrier agreed to arbitration of grievance after which each party designated its representatives on the System Board of Adjustment (see 45 U.S.C.A. 153). The Union has taken no steps since to prosecute or process the Adjustment Board hearing
 
 
 [13]
 The picketing has since been enjoined pending NLRB determination of the charges against the Union. See note 9, supra. Adding complications, the Union has filed LMRA 8(a)(3) and (5) unfair labor practice charges against Port Richmond, the Lessee. No complaint has yet issued
 
 
 [14]
 At the bottom is the duty of settlement by discussion. See, 152, First: 'First. It shall be the duty of all carriers * * * to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.'
 
 
 [15]
 '6. Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions * * *. In every case where such notice of intended change has been given * * * rates of pay, rules, or working conditions shall not be altered by the carrier until the controversy has been finally acted upon, as required by section 5 of this Act, by the Mediation Board. * * * unless a period of ten days has elapsed after termination of conferences without request for or proffer of the services of the Mediation Board.' 45 U.S.C.A. 156
 
 
 [16]
 152 'Seventh. No carrier, * * * shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section (6) of this title.'
 
 
 [17]
 Art. XVI provides: 'Seven calendar days' notice must be given employees that are laid off with notice also being given to the union.'
 
 
 [18]
 Art. XIV provides: 'The management of the elevator and the direction of the working force, including, but not limited to the right to hire, suspend, or discharge for good cause, to assign to jobs, to transfer employees within the elevator, to increase and decrease the working force, to determine the products to be handled, the schedules of operation, and the methods, procedures, and means of handling, are vested exclusively in the Carrier; provided this will not be done for the purpose of discriminating against any employee, or in any manner contrary to the provisions of this agreement.'
 
 
 [19]
 See especially Wiley & Sons v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898; also United Steel Workers v. Reliance Universal, Inc., 3 Cir., 1964, 335 F.2d 891; Wackenhut v. International Union, 9 Cir., 1964, 332 F.2d 954
 
 
 [20]
 As to this the Judge stated: 'The Court classified this controversy as a minor dispute due to the fact that the resolution of the issues involved will depend upon the interpretation of an existing agreement. There is no evidence which indicates to the Court that (the Carrier) * * * has made any move to or has any desire to change any of terms of the present collective bargaining agreement.' Consequently, 6 notice was not required. For this he found, he stated, 'ample authority in support of these propositions in the opinion recently handed down by the Fifth Circuit in St. Louis-San Francisco & Texas Ry. Co. v. Railroad Yard Masters of America, 328 F.2d 749 (1964).'
 
 
 [21]
 St. Louis San Francisco & Tex. Railway Co. v. Railroad Yardmasters of America AFL-CIO, 5 Cir., 1964, 328 F.2d 749; Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co., 5 Cir., 1959, 266 F.2d 335, reversed on other grounds, 1960, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379; Switchmen's Union of North America v. Central of Georgia Railway Co.; Brotherhood of Locomotive Engineers v. Central of Georgia Railway Co., 5 Cir., 1965, 341 F.2d 213; Brotherhood of Railway and Steamship Clerks v. Southern Railway Co. & Central of Georgia, 5 Cir., 1965, 341 F.2d 217; Aaxico Airlines, Inc. v. Airline Pilots Ass'n International, 5 Cir., 1964, 331 F.2d 433; International Ass'n of Machinists v. Eastern Airlines, Inc., 5 Cir., 1963, 320 F.2d 451
 
 
 [22]
 Brotherhood of R. Trainmen v. Chicago River & I.R. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622; Missouri-Kansas-Texas Railroad Co. v. Brotherhood of Locomotive Engineers, 1960, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379; Flight Engineers International Ass'n AFL-CIO v. American Airlines, Inc., 5 Cir., 1962, 303 F.2d 5
 
 
 [23]
 See, especially St. Louis San Francisco & Tex. Railway Co. v. Railroad Yardmasters of American AFL-CIO, 5 Cir., 1964, 328 F.2d 749; Switchmen's Union of North America v. Central of Georgia Railway Co.; Brotherhood of Locomotive Engineers v. Central of Georgia Railway Co., 5 Cir., 1965, 341 F.2d 213; Brotherhood of Railway and Steamship Clerks v. Southern Railway Co. & Central of Georgia, 5 Cir., 1965, 341 F.2d 217; Aaxico Airlines, Inc. v. Airline Pilots Ass'n International, 5 Cir., 1964, 331 F.2d 433
 
 
 [24]
 Florida East Coast Ry. v. Board of Railroad Trainmen, 5 Cir., 1964, 336 F.2d 172; Florida East Coast Railway Co. v. United States, 5 Cir., 1965, 348 F.2d 682
 
 
 [25]
 Judge Waterman for the Second Circuit in Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, 2 Cir., 1962, 307 F.2d 21, 33-34 first points out: 'In reaching for resolution of this problem of course we must not place undue emphasis on the contentions or the maneuvers of the parties. Management will assert that its position, whether right or wrong, is only an interpretation or application of the existing contract. Unions, on the other hand, in their assertions about the dispute at issue, will obviously talk in terms of change. Since a section 6 notice is required by the statute in order to initiate a major dispute, the labor representatives are likely to serve such a notice in any dispute arising out of any ambiguous situation so as thereby to make the controversy appear more like a major dispute. * * * Or they may seek to bring the particular conflict at issue within the bounds of an outstanding Section 6 notice that in reality does not relate to that dispute. * * *.' He then articulates, for that case, a standard which is helpful in testing the substance of the situation. 'It is a major dispute if the present agreements between the railroad and the brotherhoods contain express provisions contrary to the position taken by the railroad or if the clear implication of these agreements is inconsistent with the railroad's proposals. It is a minor dispute if there is a clearly governing provision in the present agreements, although its precise requirements are ambiguous; and it is also minor if what the railroad seeks to do is supported by customary and ordinary interpretations of the language of the agreements.' The Sixth Circuit likewise rejected such formalisms. Brotherhood of Railway & Steamship Clerks v. United Airline, 6 Cir., 1963, 325 F.2d 576, cert. granted, 1964, 377 U.S. 903, 84 S.Ct. 1163, 12 L.Ed. 175
 
 
 [26]
 Judge Friendly's comments for the Court may well be pertinent here: 'The effect of 6 is to prolong agreement subject to its provisions regardless of what they say as to termination.' Manning v. American Airlines, Inc., 2 Cir., 1964, 329 F.2d 32, 33
 
 
 [27]
 Order of RR Telegraphers v. Chicago & N.W. RR, 1960, 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774
 
 
 [28]
 Whether common carriers or other public utilities are as free is not at all certain. On the other hand, apparently the Carrier here did not need ICC abandonment approval to lease (or sell) these non-tract facilities. See 49 U.S.C.A. 1(18)(19)(20)(22)
 
 
 [29]
 See, e.g., the interim wage plan approved Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas Railroad Co., 5 Cir., 1959, 266 F.2d 335, reversed on other grounds 1960, 363 U.S. 528, 80 S.Ct. 1326, 4 L.Ed.2d 1379; cf. NLRB v. American Mfg. Co. of Texas, 5 Cir., 1965, 351 F.2d 74