**John J. O'DONNELL, as President of the Air Line Pilots Association International and the Air Line Pilots Association, International, an uncorporated association, Plaintiffs-Appellants,**

v.

**WIEN AIR ALASKA, INC., formerly known as Wien Consolidated Airlines, Inc., Defendant-Appellee.**

**No. 76–1422.**

United States Court of Appeals, Ninth Circuit.

April 6, 1977.

---

Henry Weiss, Robert S. Savelson, Michael E. Abram, Cohen, Weiss & Simon, New York City, argued, for plaintiffs-appellants.

John A. McGuinn, Farmer, Shibley, McGuinn & Flood, Washington, D. C., argued, for defendant-appellee.

Before DUNIWAY, ELY and CHOY, Circuit Judges.

ELY, Circuit Judge:

In this dispute between a pilots' union (ALPA) and an airline (Wien), the District Court granted summary judgment in favor

of Wien, defendant below and appellee here, and dismissed ALPA's action. While we agree with the court's reasoning, we disagree with the disposition. Accordingly, we reverse and remand with directions.

By virtue of 45 U.S.C. §§ 181–85 (1970), labor relations in the air transportation industry are governed, with some modifications, by the Railway Labor Act, 45 U.S.C., Ch. 8, §§ 151 et seq. (the Railway Act). ALPA is the duly certified collective bargaining representative for Wien's pilots. The present dispute goes back to 1968, when Wien proposed to introduce Boeing 737 jet aircraft (737's) into its service. Throughout the ensuing years, ALPA has taken the position that three pilots should be assigned to each 737 flight, while Wien has contended that, based on the cockpit configuration and FAA certification, among other factors, only two pilots were required.[1] There have been a number of short-lived agreements between the parties over the intervening years, and the parties, particularly Wien, have followed certain practices under these agreements, but no lasting resolution of this basic issue has ever been reached.

Each of these agreements provided, at least pro forma, that three pilots should be assigned to each 737 flight, although each agreement, either by its short term or by express provision, left open the long-term resolution of the three-pilot issue. The agreements, although differing in detail on the precise terms, likewise incorporated the provisions of the basic agreement with ALPA, covering all ALPA pilots employed by Wien. The most important of these provisions for present purposes was that pilots employed for less than one year were on a probationary status and were not entitled to the benefit of grievance and arbitration procedures set forth in the contract. One of the practices principally objected to by ALPA has been the repeated discharge of third-pilot probationers, often on the eve of contract negotiations, in an apparent effort by Wien to avoid being locked into a three-pilot commitment. The discharged probationers were often reemployed for service on propeller-driven aircraft. The combination of these two practices has come to be known as the "fire-hire" policy and has formed one of the principal bases for ALPA's complaint.

Another practice to which ALPA has objected was Wien's repeated policy of obtaining the signatures of individual pilots on each agreement, and often on letters expressing Wien's interpretations thereof. ALPA claims that this was subversive of ALPA's statutory role as collective bargaining representative, while Wien asserts that these were non-contractual acts and intended for notice purposes only.

ALPA also claims that Wien has not negotiated in good faith. All of the foregoing, together with other of Wien's acts, ALPA charges to be "unfair labor practices." We note that the quoted term is a technical word of art in the labor relations field and is not correctly used in connection with the Railway Act.

In more detail, the facts leading to the litigation below and the manner in which the court dealt with the problem are as follows:

In 1968, Wien first proposed, as noted above, to introduce 737's and was confronted with the union's three-pilot demand. Wien entered into temporary arrangement for the employment of three pilots, the arrangement to remain in effect until either party notified the other of an intended change by notice pursuant to 45 U.S.C. § 156 (commonly known as a "Section 6 notice").

Such notice was in fact served by Wien upon ALPA less than a year later, and following failure to resolve the issue by direct negotiations, Wien invoked the jurisdiction of the National Mediation Board, which set a mediation session for late June, 1970. Prior to this session, Wien taking advantage of the one-year probationary period provided in the underlying agreement

1. It appears from various references in the record that this dispute has pervaded the airline industry, although this does not affect the disposition of the present controversy.

with ALPA incorporated in the 1968 agreement,[2] initiated the fire-hire procedure and discharged four probationary pilots.

Shortly thereafter, and while the matter was still pending before the Mediation Board, ALPA filed its original complaint herein, seeking primarily a cessation of the fire-hire policy but alleging in addition that the controversy in respect to the number of pilots was in a stage of mediation before the Board. ALPA moved for a preliminary injunction, and Wien countered with a motion for summary judgment. Prior to disposition of these motions, however, a second interim agreement was reached, in effect continuing the previous agreement pending the settlement of the underlying three-pilot issue by the Mediation Board. All further proceedings were thereupon taken off calendar by a consent order of the court. Further interim agreements were thereafter reached in 1972 and 1974, while the lawsuit remained dormant; meanwhile, Wien intermittently revived and discontinued the fire-hire procedure. By letter to 737 pilots, Wien advised them of the pendency of the dispute and stated that until the dispute could be definitively resolved, all third pilots should be aware that their employment would be terminated prior to the end of the first year. The pilots so addressed were asked to, and did, sign a receipt for such letter, the intent and effect of such signature being in dispute between the parties.

The status of the proceedings before the Mediation Board following the 1969 submission is not entirely clear from the record. It may be fairly inferred, however, that a number of Section 6 notices were filed, and that, while some of them may have been noted by new agreements, it apparently is undisputed that at least in some fashion the underlying three-pilot dispute is currently pending before the Mediation Board. In any case, in 1972 Wien agreed to continue the three-pilot employment on 737's until it was decided by a so-called "neutral umpire"

or arbitrator agreed upon by the parties. The "umpire" did not decide the long-term issue, deciding only that the three-pilot crew should be retained during the remaining life of the then-current agreement, that of 1972.

As the expiration of the 1972 agreement drew nearer, negotiations were undertaken. These resulted in a new agreement in 1974, which expressly declared that the three-pilot issue was "open." The parties agreed to submit that issue to the Mediation Board, pending whose decision the status quo would be preserved, with, however, a certain redefinition of the probationary period.

There ensued, however, continuing disputes between the parties, including the resumption of the fire-hire policy by Wien, and, as a result, ALPA ultimately applied to the District Court for permission to amend its complaint and reactivate the long-dormant litigation. ALPA filed an amended complaint substantially similar to the original complaint, adding allegations regarding developments that had occurred subsequently. In other words, the entire history of the controversy, extending back to 1968, was set forth in the amended complaint and in the various affidavits that were served in connection with the ensuing motions.

As before, ALPA prayed for an injunction against any change in the rates of pay, rules, and working conditions of 737 pilots, including discharge under the fire-hire policy, until the three-pilot controversy had been acted upon pursuant to the provisions of the Railway Act, a declaratory judgment with respect to rights of the parties, damages, and general relief.

 ALPA again moved for a preliminary injunction, and Wien again countered with a motion, apparently in the alternative, either to dismiss or for summary judgment, citing only Fed.R.Civ.P., Rule 56.[3]

---

**2.** As previously mentioned, each of the agreements bearing on the three-pilot controversy were in effect addenda to the underlying agreement and, except as otherwise provided, incorporated its provisions.

**3.** We attach no particular significance to the technical question of whether the motion to dismiss was made for lack of jurisdiction over the subject matter (Fed.R.Civ.P., Rule 12(b)(1)) or for failure to state a claim upon which relief

The District Court granted Wien's motion in its entirety, dismissing the action with prejudice and at the same time rendering summary judgment in favor of Wien.[4]

This case, and our disposition of it, can best be understood against the background of the history of the Railway Act, set forth in a typically comprehensive fashion by Mr. Justice Rutledge in *Elgin, J. & E. R. Co. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945), *aff'd on rehearing,* 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946). That opinion clarified the distinction between "major" and "minor" disputes in a manner that has since, of course, been generally applied. *E. g., Railway Labor Executives Ass'n v. Atchison, T. & S. F. Ry. Co.,* 430 F.2d 994 (9th Cir. 1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971).

Without attempting to reiterate or expand upon that detailed exegesis, the history and structure of the Railway Act may be summarized as follows: The Act was originally enacted in 1926, almost a decade before the National Labor Relations Act (originally 1935, now the Labor-Management Relations Act, 29 U.S.C. §§ 141, *et seq.* (1947) (Relations Act)). The Railway Act represented a pioneer federal attempt to secure the peaceful settlement of employer-employee disputes, previously characterized by strikes, lockouts, and other disruptive forms of self-help. Understandably, the first curative efforts were directed to the railway and closely related industries ("Carriers," 45 U.S.C. § 151), which were far and away the primary carriers of goods and passengers in interstate commerce. Strikes, lockouts, and other labor disturbances in the industry not only tended toward extreme bitterness, strife, and even physical violence, but also literally ground the national economy to a halt.

As Congress saw the situation in 1926, the principal cause of such strikes was the failure of labor and management representatives to agree upon labor contracts that were fair to labor and management alike. The courts were ill-equipped, in terms of expertise, available remedies, and speed, to effectuate speedy settlements of disputes arising in contract negotiations.

The Railway Act as originally enacted, therefore, set forth the rights and duties of carriers and their employees, including the employees' right to organize and bargain. While prohibiting certain types of agreements, it expressly permitted others and, perhaps most importantly, created procedures and federal administrative machinery to facilitate the selection of bargaining representatives and the reaching of agreements. *See, e. g.,* 45 U.S.C. § 152 (by bringing in where necessary impartial arbitrators); 45 U.S.C. § 157 providing for the ultimate services of the Board of Mediation as it was originally entitled);[5] 45 U.S.C. §§ 154, 155. So as to avoid the interruption of service while all these procedures were being undertaken, each step, commencing

---

can be granted (Rule 12(b)(6)). Although Rule 12 appears to limit the consideration of matters outside the pleading to motions arising under Rule 12(b)(6), it is well settled that the court must dismiss *sua sponte* at any time its lack of jurisdiction appears by any means. Fed.R. Civ.P., Rule 12(b); *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Zank v. Landon,* 205 F.2d 615 (9th Cir. 1953); 2A Moore, *Federal Practice,* ¶ 12.09[3] (2d ed. 1976).

4. In our view, this result was both inconsistent in itself and improper. *Jones v. Brush,* 143 F.2d 733 (9th Cir. 1944); *Solomon v. Solomon,* 516 F.2d 1018 (3rd Cir. 1975). The principle underlying *Brush* is that the tenor of Rule 56 suggests that summary judgment thereunder deals with the merits; "if in favor of the de-

fendant the judgment is in bar and not in abatement." 6 J. Moore, Moore's Federal Practice ¶ 56.03, at 56–55 (footnote omitted) (2d ed. 1976). Lack of subject matter jurisdiction is properly a matter in abatement, and not properly disposable in a motion for summary judgment. It is therefore error to rule on a summary judgment motion—or any other matter going to the merits—where a court determines that it lacks jurisdiction over the subject matter. *Id.* at 56–57 & n. 8. For a discussion of the proper resolution of this kind of problem, *see Martucci v. Mayer,* 210 F.2d 259 (3rd Cir. 1954).

5. Name changed by the 1934 amendments, discussed *infra,* to National Mediation Board, referred to herein as the "Mediation Board."

with conferences between labor and management and proceeding through arbitration and final award by the Mediation Board, was subjected to time limitations, purposely "long and drawn out," *Railway Clerks v. Florida E. C. Ry. Co.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966); *Shore Line v. Transportation Union*, 396 U.S. 142, 149–50, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). The federal courts were by necessary implication thus authorized to issue injunctions maintaining the status quo pending the exhaustion of these procedures. 45 U.S.C. §§ 152, 155, 156.[6]

Such disputes, involving the negotiation of new contracts or changes in the terms and conditions of existing contracts, subsequently became known as "major" disputes.

By 1934, however, it had become obvious that there was another serious cause of turmoil in the railway industry, *i. e.*, disputes as to existing rights and the interpretation and enforcement of existing agreements, where no substantive changes were involved. Ordinarily, these involved only a handful of employees, but situations developed from time to time when varying interpretations of the provisions concerning wages, hours, and working conditions were so widespread and controversial that they led to strikes, lockouts, and other disruptions of a magnitude equalling those resulting from the failure initially to reach unambiguous agreement on such matters.

Here, of course, was an area, the interpretation and enforcement of contracts, in which the courts were long accustomed to function. However, in this technical and specialized field they again often lacked the expertise and expeditious procedure required to fend off paralyzing controversies in the industry. Therefore, Congress, in amending the Act in 1934, adopted a different device or series of devices to resolve such disputes expeditiously. First, the parties to agreements were encouraged[7] to set up by contract one or more "adjustment boards" to hear and determine initially employer-employee disputes over the interpretation and applicability of provisions of existing contracts. 45 U.S.C. § 153. Next, arbitration in such disputes was encouraged, to be assisted if necessary by the Mediation Board, 45 U.S.C. § 155. Finally, the dispute was to be referred to the newly-created National Railroad Adjustment Board (Adjustment Board), which had the power to make a binding award, reviewable and enforceable in the courts. 45 U.S.C. § 153. Disputes of this character, arising from the interpretation and application of existing agreements, came to be known as "minor" disputes. The creation of the major-minor distinction between the two types of disputes and the resulting need for classification of labor-management disputes into one category or the other had far-reaching consequences in respect to the timing and role of the judicial function, including the jurisdiction of the courts themselves.

While the major-minor distinction may seem intuitively clear, the various Circuits have devoted considerable time and thought to determining when particular factual situations fall into one or the other of the categories. For a scholarly and exhaustive analysis of the then extant case law in the area, *see generally* Harper, *Major Disputes under the Railway Labor Act*, 35 J.Air L. & Comm. 3, 12–27 (1969). .

█ The leading case in our Court is *Switchmen's Union v. Southern Pacific Co.*, 398 F.2d 443 (9th Cir. 1968), which approvingly cited *United Industrial Workers of the Seafarers Int'l Union v. Board of Trustees*, 351 F.2d 183 (5th Cir. 1965) (the "Galveston Wharves" case), the leading Fifth Circuit statement of the same general principle. Under *Switchmen's*, the question on review is a narrow one: Is the position of at least one of the parties *arguably* predicated on the terms of an agreement? The test is not a stringent one in view of the substantial and long-standing interest in re-

---

**6.** In addition, see § 160, relating to emergency boards convened by the President.

**7.** Later required, as to airline employees and employers, by the act bringing them under the Railway Act. 45 U.S.C. § 184.

moving labor disputes from the federal courts and placing them in the expert hands of the various arbitration and mediation facilities. *See Northwest Airlines v. ALPA,* 442 F.2d 246 (8th Cir. 1970), *aff'd on rehearing,* 442 F.2d 251, *cert. denied,* 404 U.S. 871, 92 S.Ct. 70, 30 L.Ed.2d 116 (1971).

*Switchmen's* reasoned as follows:

It is true, as the union points out, that a controversy, although couched in terms of a disagreement as to interpretation of a contract, may under some circumstances be regarded as a major dispute. This result may be reached if it can be said that the change being imposed by one side on the other is in nowise contemplated or arguably covered by the agreement. The provisions of the Railway Labor Act may not be avoided merely through the device of unilateral action which the actor purposefully intends shall not become a part of the agreement. The major-minor dispute dichotomy does not relate to artfully contrived formalistic demands or responses, but to matters of substance. [citations omitted]

But where the position of one or both of the parties is expressly and arguably predicated on the terms of the agreement, as illuminated by long-standing practices, the question of whether the position is well taken involves a minor dispute.

398 F.2d at 447. The rule of *Switchmen's* has been consistently followed in our Circuit and has been adopted in other Circuits as well. Indeed, the Third Circuit recently noted that all of the Circuits which have reached the question have adopted a rule "identical or similar to" that of *Switchmen's.* Only the Fourth and Tenth Circuits had not decided the question. *United Transportation Union v. Penn Central Trans. Co.,* 505 F.2d 542, 544 & n. 5 (3rd Cir. 1974). *See especially International Bhd. of Electrical Workers v. Washington Terminal Co.,* 154 U.S.App.D.C. 119, 473 F.2d 1156, 1172–73, n. 37 (1972), *cert. denied,* 411 U.S. 906, 93 S.Ct. 1530, 36 L.Ed.2d 195 (1973) ("where the dispute is even arguably a minor one [the adjustment board] should have

the first opportunity to evaluate and decide it"); *Local 1477 United Trans. Union v. Baker,* 482 F.2d 228, 230–31 (6th Cir. 1973) (if controlling formal documents do not unambiguously answer the dispute, Congress intended that an adjustment board shall be the tribunal of first resort).

■ Our Court's decisions have subsequently refined the *Switchmen's* rule. In *Railway Labor Execs. Ass'n, supra,* 430 F.2d at 997, the Court observed that notwithstanding a party's attempt to recharacterize the facts as a tort action in violation of a statutory duty, the provisions of the Railway Labor Act "relate to matters of substance, not form," and that if

the dispute grows out of the employment relationship and, in the final analysis, involves an attempt to impose a right which is incident to that relationship, the statutory forum is the Adjustment Board, absent a clear expression of legislative policy to the contrary.

An alternative statement of the *Switchmen's* rule was quoted with approval in *Southern Pacific Trans. Co. v. United Trans. Union,* 491 F.2d 830 (9th Cir.), *cert. denied,* 416 U.S. 985, 94 S.Ct. 2389, 40 L.Ed.2d 762 (1974), to the effect that when a contract provision is "reasonabl[y] susceptible" to a party's interpretation, the dispute is minor.

■ The critical issue which this case presents is whether the fire-hire policy is so intimately tied to the crew complement dispute, admittedly a major dispute, that the very nexus converts the entire context into a major dispute. The difficulty arises out of the fact that the federal courts have no jurisdiction initially to resolve the minor dispute. They are empowered only to issue an injunction maintaining the status quo with respect to the major dispute. *See Southern Ry. Co. v. Brotherhood of Locomotive Firemen,* 119 U.S.App.D.C. 91, 337 F.2d 127 (1964). The District Court found that the two issues were separate, based on an attachment to the 1974 collective bargaining agreement between the parties:

WHEREAS, the Company and the Association have resolved all issues in the

making of an Agreement to be effective May 1, 1974, with the exception of the crew complement on B–737 aircraft, those resolved issues will be put into effect on those dates stipulated in the Agreement and the crew complement on B–737 aircraft will remain an 'open issue'.

NOW THEREFORE, the parties agree that during the period that the crew complement on the B–737 aircraft remains as an 'open issue', the parties shall preserve the status quo, as required under the Railway Labor Act, as amended, with respect to the use of three (3) pilots on the B–737 aircraft. In addition, during the period that this issue remains open, either party may request further conferences in an attempt to resolve the issue and in the event such conferences are unsuccessful either party may request mediation.

It is the intent of this Letter of Agreement that all of the provisions of the Railway Labor Act shall apply to the B–737 crew complement issue as being an unresolved issue arising out of Section 6 notices exchanged between the parties in October 1973.

The court reasoned that the fire-hire issue was thus ultimately resolved in principle by the 1974 contract, since the crew complement question was expressly described as the only remaining "open" issue.

■ We agree with ALPA's contention that the two issues are intertwined, or, to vary the metaphor, that the fire-hire issue is the fruit of the fundamental, unresolved controversy with respect to third pilots. In this view, it does not matter for present purposes whether the fire-hire issue, standing alone, is a major or a minor one; we agree that it is probably the latter. But the court was also faced with the indisputably major third-pilot issue, which was pending before the Mediation Board as a result of numerous Section 6 notices. It therefore became the duty of the court to issue an injunction maintaining the status quo pending a final resolution of this issue. The District Court belatedly recognizes this as a possibility, if not a requirement, although noting that it would have difficulty in determining just what was the status quo to be maintained, especially with reference to the fire-hire situation.

The basis upon which the status quo is to be determined for purposes of Railway Act injunctions is carefully set forth in *Shore Line v. Transportation Union, supra*, of which the court takes note.

We agree with the underlying motivation of the District Court's judgment, that is, that the matters in controversy should be at least initially resolved by the procedures set forth under the Railway Act,[8] but we do not believe that either dismissal or summary judgment, let alone both, was correct, even on the court's own view. If no more than a "minor" issue was involved, the court should have dismissed for lack of jurisdiction; if, as we hold, a "major" issue was also presented, a status quo injunction was required if warranted by the situation. *United Transp. U., Loc. L. No. 31 v. St. Paul Union Depot Co.*, 434 F.2d 220 (8th Cir. 1970), *cert. denied*, 401 U.S. 975, 91 S.Ct. 1194, 28 L.Ed.2d 324 (1971). On no view can summary judgment be justified.[9] We conclude that the preferable disposition was a determination by the court of the status quo in accordance with *Shore Line*, the issuance of an injunction maintaining the status quo, the reference to the Adjustment Board for the resolution of all "minor" disputes, and the retention of jurisdiction of the cause for any proceedings that may ultimately be necessary to enforce the injunction, to resolve any major disputes, if such should remain following the exhaustion of the administrative processes, or to carry into effect the results of the adminis-

---

**8.** Counsel conceded at oral argument that allegations of "unfair labor practices" could raise the issue of a major dispute, and that if both major and minor disputes were alleged in a complaint, the District Court possessed discre- tion to either proceed with the case or refer the controversy, *ab initio*, to the Adjustment Board for resolution of the minor disputes.

**9.** *See* footnote 4, *supra*.

trative procedure in accordance with the provisions of the Railway Act. A case rather closely in point, involving both major and minor disputes, is *Southern Ry. Co. v. Brotherhood of Locomotive Firemen, etc.,* 119 U.S.App.D.C. 91, 337 F.2d 127 (1964).

The judgment of dismissal is reversed, and the cause is remanded to the District Court for further proceedings harmonizing with this opinion.

REVERSED AND REMANDED, with directions.