650 F.2d 949
 103 L.R.R.M. (BNA) 2669, 104 L.R.R.M. (BNA) 2619,
104 L.R.R.M. (BNA) 3142, 88 Lab.Cas. P 11,842,
89 Lab.Cas. P 12,270
 TRANS INTERNATIONAL AIRLINES, INC., Plaintiff-Cross-Appellant,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, etc., Airline
Division Teamster Local 2707; Marvin G. Griswold;
Teamster Local 732, Defendants-Cross-Appellees.
TRANS INTERNATIONAL AIRLINES, INC., Plaintiff-Appellee/Cross Appellant,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS, et al., Airline
Division, Teamsters Local 2707, and Air Line
Pilots Association, International,
AFL-CIO,
Defendants-
Appellants/Cross
Appellees.
 Nos. 77-3362, 77-3363, 77-3395, 77-3781, 78-1148 and 78-1232.
 United States Court of Appeals,
Ninth Circuit.
 Decided Feb. 14, 1980.
As Amended June 2, 1980.
As Amended March 14, 1980.
Rehearing and Rehearing En Banc Denied June 27, 1980.
 
 Charles Kelso, Fisher & Phillips, Atlanta, Ga., argued, Robert W. Ashmore, Atlanta, Ga., Robert T. Fries, Steinhart, Falconer & Morgenstein, San Francisco, Cal., on brief, for plaintiff-cross-appellant.
 Roland P. Wilder, Washington, D. C., argued, Robert S. Savelson, New York City, Robert M. Baptiste, Kenneth N. Silbert, Brundage, Beeson, Tayer & Kovach, San Francisco, Cal., Washington, D. C., on brief, for defendants-cross-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before GOODWIN, WALLACE, and KENNEDY, Circuit Judges.
 KENNEDY, Circuit Judge:
 
 
 1
 This case requires a determination, among other matters, of the extent to which the anti-injunction mandate of the Norris-LaGuardia Act, 29 U.S.C. §§ 101 et seq., is applicable to common carriers and collective bargaining units subject to and regulated by the Railway Labor Act (RLA), 45 U.S.C. §§ 151 et seq.[1] The RLA extends to airlines, 45 U.S.C. §§ 181-188, and Trans International Airlines (TIA), a principal party in this case, is one of the nation's largest supplemental air carriers. On November 30, 1976, TIA merged with Saturn Airways. The company operates separate flights for military and civilian carriage, transporting passengers and freight on both kinds of flights. At issue are two strikes against TIA, a primary strike by TIA's flight attendants and a sympathy strike by its flight engineers and pilots. At the time of the events in question both the flight attendants and the engineers are represented by the International Brotherhood of Teamsters, Airline Division (Teamsters). TIA's pilots are represented by the Air Line Pilots Association (ALPA), which also represented the premerger Saturn pilots.[2] The company obtained federal injunctive relief prohibiting both strikes to the extent they were directed to military flights, but the district court did not enjoin the strikes against civilian flights. Both the company and the affected Teamsters unions appeal from the rulings.
 
 
 2
 The contract negotiations between the Teamsters and the company, and the subsequent strikes, have the following history. TIA and the flight attendants were parties to a collective bargaining agreement for the period July 21, 1974, to April 1, 1976. The agreement contained a general no-strike clause, effective "during the term of this agreement." At the heart of the dispute over the legality of the primary strike lie further contract provisions, by which the parties agreed there would be no strikes against military flights and that this clause was effective "after the expiration of this agreement and/or during and after procedures of the Railway Labor Act have been exhausted . . . ."[3] In February of 1976 the Teamsters, acting for the flight attendants, served a notice of intent to amend the agreement. Under the Railway Labor Act this is a section 6 notice, which signals the union's intent to negotiate a new employment agreement. 45 U.S.C. § 156. The contract expiration date (April 1, 1976) arrived without the parties having reached accord. Pursuant to the provisions of the Railway Labor Act, the agreement remained in force during the dispute resolution procedures set in motion by the section 6 notice. See id. Further negotiations between the parties produced no agreement, and a mediator was assigned by the National Mediation Board on August 19, 1976.
 
 
 3
 The union refused voluntary arbitration, the mediator withdrew, and after expiration of the statutory 30-day cooling off period expired at midnight, September 7, 1977, the flight attendants struck all flights. TIA's flight engineers and pilots, in a sympathy strike, honored the flight attendants' primary strike and refused to cross the picket line.
 
 
 4
 TIA applied to the district court for an order prohibiting these groups of employees from striking. The district court ultimately granted a preliminary injunction prohibiting the flight attendants from striking TIA's military flights, but denied an injunction prohibiting flight attendants from striking TIA's other operations. A similar injunction was issued against the flight engineers and pilots, enjoining the sympathy strike as to military flights only.
 
 
 5
 In this court, the Teamsters moved to stay the military strike injunctions, and TIA moved for temporary injunctive relief pending decision of the appeal. Oral argument on these motions was heard by this panel. In addition to the motions for preliminary relief, the principal appeal from the district court's preliminary injunctions is pending before this circuit. Further, TIA and ALPA have filed separate appeals. Some of the issues raised in these appeals were not argued in the parties' motions for interim relief. Concluding, however, that further oral argument in these cases is unnecessary, these appeals, Nos. 77-3362, 77-3363, 77-3395, 77-3781, 78-1148 & 78-1232 are considered submitted to this panel on the date of filing of this opinion, and their disposition is controlled by this opinion.
 
 
 6
 In general, three contentions are advanced by the parties. First, quite apart from the argument that federal courts are prohibited by statute from enjoining the strikes, the Teamsters contend that TIA was not entitled to seek a preliminary injunction because the company's actions during the strike were so unfair that the company had unclean hands. In summary, the Teamsters claimed that TIA improperly stranded flight attendants at foreign ports; hired replacements; expanded the number of military flights (which the district court had enjoined the flight attendants, engineers and pilots from striking); terminated pilots for refusal to fly commercial planes or for other carriers; refused sick pay and monthly guarantees to strikers; and violated seniority rights in the selection of pilots for the military flights.
 
 
 7
 Second, TIA argues that the Teamsters' conduct during the course of the major disputes mediation procedures violated section 152 First of the RLA, which requires parties "to exert every reasonable effort to make" a collective bargaining agreement. If that were so, there would be authority to enjoin the strike and require the Teamsters to return to the bargaining table. See Chicago & N. W. Ry. v. United Transportation Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971). The principal bases of TIA's claim are (1) that the Teamsters, in the process of negotiating the integration of the premerger Saturn and TIA flight attendant agreements, more than doubled the number of proposals on the bargaining table by requesting approximately 200 contract changes after a year of negotiations and six months prior to the strike, and (2) that the cost of the Teamsters' initial proposal for flight attendants exceeded 250% of TIA's then-present payroll costs for TIA flight attendants, and its proposals after mediation by the National Mediation Board exceeded 200% of TIA's total company-wide profits for 1976 and represented a 294.6% increase in flight attendant payroll costs.
 
 
 8
 Finally, even if enjoining the Teamsters' strike was not proper because of the union's bargaining tactics, TIA contends an injunction against strikes of military flights was proper because, among other reasons, the various groups of employees had promised not to strike TIA's military operations, even after bargaining under the RLA's disputes resolution procedures had been exhausted, and that an injunction against the sympathy strikes was proper pending minor dispute arbitration of the legality of the strikes.
 
 
 9
 The strikes which were the subject of this lawsuit have been settled, and a new collective bargaining agreement was signed on January 12, 1978.[4] We must first decide whether this appeal is now moot.
 
 
 10
 We hold these appeals are not moot, primarily because resolution of the issues presented is crucial to deciding a substantial pending claim for damages sought by TIA against the Teamsters. The district court's preliminary injunctions were entered on September 26, 1977, and September 28, 1977. On October 26, 1977, the district court entered a further order in which it rejected the Teamsters' and ALPA's claim that TIA had "unclean hands" and thus was not entitled to the injunctions. This order formed the basis for appeals number 78-1148 and 78-1232. The Teamsters continued to urge employees to strike military flights. On November 1, 1977, the Teamsters were adjudicated in contempt of the district court's orders. TIA alleges its military operations were virtually shut down by striking flight attendants and flight engineers, causing TIA approximately $400,000 in compensatory damages which it still seeks to recover from the Teamsters. The matter of compensatory fines was stayed by the district court on January 24, 1978, "pending the results of the appeals before the Court of Appeals for the Ninth Circuit in TIA v. Teamsters, Nos. 77-3362/3363/ 3395/3781."
 
 
 11
 Thus, the right of TIA to recover its alleged damages and the extent of recovery will be controlled, in part, by resolution of the overriding issue in these appeals: whether TIA was entitled to injunctive relief against either the primary or the sympathy strike. See, e. g., Lewis v. S. S. Baune, 534 F.2d 1115, 1119 (5th Cir. 1976) ("A judgment of civil contempt, being remedial in nature, stands or falls with the validity or invalidity of the order, and the opposing party should be compensated only if he was entitled to the order."); Latrobe Steel Co. v. United Steelworkers, 545 F.2d 1336, 1345-46 (3d Cir. 1976). Under these circumstances this appeal presents a live case or controversy for our decision.
 
 
 12
 The Teamsters agree that if the compensatory fine proceeding is permitted to continue, the issues presented on this appeal must be decided. They conclude, however, that we should order dismissed the contempt proceedings as well as these appeals. The Teamsters' argument is essentially this: in evaluating whether the controversy presented by this appeal from the original orders is moot, this court may not examine the posture of the pending contempt proceedings. We should, it is argued, decide whether this appeal is moot without reference to the possibility of damage liability in the contempt proceedings below, and if we determine the case is moot we should also instruct the district court to dismiss the contempt proceedings. We disagree with that reasoning.
 
 
 13
 The Teamsters contend we are governed by Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911). Procedurally Gompers does resemble this case. The company had secured an injunction against a boycott. Appeals were taken from this injunction. Before the appeal was decided, the company initiated contempt proceedings, and the defendants were adjudicated in contempt and sentenced to jail sentences. The original injunctive decree was upheld by the court of appeals, and some time later the contempt adjudication was also affirmed. By the time the appeals from the original injunction reached the Supreme Court, the parties had settled their differences. The Court accordingly dismissed the appeal as moot. Buck's Stove & Range Co. v. American Federation of Labor, 219 U.S. 581, 31 S.Ct. 472, 55 L.Ed. 345 (1911). Thereafter the Court also dismissed the appeal of the contempt adjudication as moot. It held:
 
 
 14
 (W)hen the main cause was terminated by a settlement of all differences between the parties, the complainant did not require and was not entitled to any compensation or relief (in the contempt proceedings).
 
 
 15
 221 U.S. at 451-52, 31 S.Ct. at 503. Gompers has subsequently been refined, see, e. g., Backo v. Carpenters Local 281, 438 F.2d 176, 182 (2d Cir. 1970), cert. denied, 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1971), but we think the Teamsters' discussion of Gompers and its progeny ignores a crucial distinction between that case and the instant case.
 
 
 16
 In Gompers, the parties had entered into a settlement which completely resolved all matters involved in the litigation between them. 221 U.S. at 451, 31 S.Ct. at 502; 219 U.S. 581, 31 S.Ct. 472. The determinations of mootness were predicated on this finding. In our case, by contrast, there has been no out-of-court settlement by the parties of "every material controversy which the record present(s)." 219 U.S. at 581, 31 S.Ct. at 472. The strike has ended and the parties have signed a new collective bargaining agreement, but this does not constitute a settlement of the controversies which spawned this litigation. A recent Third Circuit case illustrates the point. In Bituminous Coal Operators' Association, Inc. v. U. M. W., 585 F.2d 586 (3d Cir. 1978), the employer had sued for both injunctive relief and damages. While the appeal from the district court's orders was pending, the collective bargaining agreement which was allegedly breached expired and a new agreement was signed. The union argued that this development mooted the case; the court of appeals disagreed:
 
 
 17
 We note at the outset that the expiration of the 1974 agreement and the execution of the 1978 agreement have not mooted a claim for damages by the mine owners.
 
 
 18
 Id. at 599.
 
 
 19
 The possibility of compensatory damage liability in this case arises from the civil contempt adjudication and not, as in Coal Operators, from a damages action under the NLRA. We perceive no constitutional distinction in this fact. Cf. Latrobe Steel Co., supra, 545 F.2d at 1345-46. A proceeding for civil contempt is part of the original action. See, e. g., Gompers, supra, 221 U.S. at 444-45, 31 S.Ct. at 499-500. For purposes of determining whether a live controversy exists on this appeal from the injunctive orders of the district court, we may consider the fact that the union has been adjudicated in civil contempt of those orders, and that imposition of substantial compensatory damages depends on resolution of the issues presented on this appeal. Cf. also American Bible Society v. Blount, 446 F.2d 588 (3d Cir. 1971); Meyers v. Jay Street Connecting Railroad, 288 F.2d 356 (2d Cir. 1961).[5]
 
 
 20
 The Teamsters raise another, more limited, mootness argument. They contend TIA's appeal from the district court's refusal to enjoin a strike against its commercial operations is moot. Noting that TIA's flight attendants (but not its engineers) now have a different bargaining representative (the Association of Flight Attendants), the Teamsters argue there can be no expectation that TIA will be subjected again to the Teamsters' alleged bad faith bargaining tactics. We reject this argument. If the Teamsters did not make a reasonable effort to reach an agreement during major disputes bargaining, see p. 2052 infra, its strikes against both commercial and military flights could be enjoined. The union's bargaining conduct was an alternative ground in addition to the military no-strike clause for the injunction underlying the contempt order. For this reason alone, even apart from our reluctance to fragment this appeal into "live" and "moot" issues, and the possibility that the dispute is not moot under the "capable of repetition yet evading review" standard, see Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975); Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 187, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979); Amalgamated Transit Union v. Greyhound Lines, Inc., 550 F.2d 1237, 1238 n.1 (9th Cir.), cert. denied, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977), the union's bargaining behavior is part of the live case or controversy before us. See Coal Operators, supra, 585 F.2d at 600.
 
 
 21
 Turning to the merits, we address first the clean hands issue. We affirm the district court's finding, on the motion for preliminary relief, that TIA was not prevented from seeking injunctive relief because of its own conduct. Without explicitly passing on the accuracy of the Teamster's characterization, the district court concluded:
 
 
 22
 TIA's varied and extensive efforts to continue its operations during the current strike in an attempt to defeat the strike . . . are all legally permissible and fairly common methods of countering the impact of a strike . . . These parties are engaged in a hard-fought labor dispute that unfortunately has resulted in a test of their relative economic strength. In such a situation, it is not unusual or unfair for both sides to resort to all of the weapons legally available to them.
 
 
 23
 The activities of which the union complains are not discussed in detail in the district court's opinion of October 26, 1977,[6] but the parties have presented their views of TIA's conduct in their briefs. Having reviewed their contentions, we cannot conclude that the district court applied a legally improper standard or made clearly erroneous findings of fact. On the motion for preliminary relief it was not improper to conclude that the practices complained of were not sufficiently likely to be found illegal or otherwise wrongful that TIA should be prevented from seeking injunctive relief. See Illinois Central R. R. v. Brotherhood of R. R. Trainmen, 398 F.2d 973 (7th Cir. 1968); Brotherhood of R. R. Trainmen v. Akron & B. B. R. R., 128 U.S.App.D.C. 59, 92, 385 F.2d 581, 614 (D.C. Cir.), cert. denied, 390 U.S. 923, 88 S.Ct. 851, 852, 19 L.Ed.2d 983 (1968); Long Island R. R. v. System Federation No. 156, 368 F.2d 50 (2d Cir. 1966).
 
 
 24
 Similarly, we affirm the district court's finding that the Teamsters did not violate the obligations imposed by section 152 First in the course of their bargaining with TIA. The facts allegedly demonstrating the Teamsters' lack of reasonable effort to make an agreement have already been described. The district court, in finding no violation, noted that the increase in the number of Teamster bargaining proposals, from 61 in early 1976 to over 200 in March of 1977, was a reasonable response to the merger between TIA and Saturn:
 
 
 25
 The testimony heard by the court on this matter indicates that what the Teamsters were trying to do with the introduction of their March, 1977, proposal was to integrate the old Saturn and old TIA agreements, taking the best from both. Since the carriers were newly merged and the Teamsters were now representing a larger group of flight attendants, it hardly seems unreasonable for them to modify their previous proposal substantially to meet the new conditions.
 
 
 26
 The court found, "negotiations did not get under way ( ) in earnest until approximately the time the Teamsters introduced their new proposal," and concluded that the increased number of proposals was reasonable in light of the recent merger between TIA and Saturn. The district court's finding is not clearly erroneous and must be affirmed. Similarly, its finding that the assertedly exorbitant size of the Teamsters' proposals regarding wages, benefits, and working conditions did not demonstrate a refusal to make reasonable efforts to reach an agreement must, on this record, also be affirmed. The court held: "The court can find no previous decision under the RLA, nor can TIA suggest one, which has inferred lack of reasonable effort solely from the size of the proposals put forth by the parties." The court noted that the union had reduced its proposals on two occasions, and characterized the bargaining as "obstinate and unyielding" but not in violation of the statutory standards.
 
 
 27
 We do not hold that a union's insistence on proposals of the kind involved here could never be the basis for a finding that a union did not comply with its obligations under section 152 First; but in this case the district court's finding is not clearly erroneous. Cf. REA Express, Inc. v. Brotherhood of Railway Clerks, 358 F.Supp. 760, 772 n.43 (S.D.N.Y.1971) and cases cited therein. Cf. also Atlantic Coast Line R. R. v. Brotherhood of Railway Trainmen, 262 F.Supp. 177, 183-85 (D.D.C.1967).
 
 
 28
 We are confronted, then, with TIA's argument that injunctive relief against the primary strike was appropriate because of language contained in the collective bargaining agreement. The Teamsters argue that the district court lacked jurisdiction to issue the injunction by reason of section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, maintaining that once the major dispute mechanisms of the RLA had been exhausted, the unions could not be enjoined from using their full economic power in support of their demands. We agree.
 
 
 29
 The accommodation reached between the Norris-LaGuardia Act and the National Labor Relations Act does not necessarily carry over to disputes controlled by the RLA. In this regard, the Supreme Court has stated: "The relationship of labor and management in the railroad industry has developed on a pattern different from other industries. The fundamental premises and principles of the Railway Labor Act are not the same as those which form the bases of the (NLRA) . . . ." Brotherhood of Railroad Trainmen v. Chicago River & I. R. R., 353 U.S. 30, 31-32 n.2, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). On the other hand, in cases which present difficult questions under the RLA but do not require statutory interpretations that are unique to the mechanisms of that Act, the doctrines developed by Congress and the courts from their experience in questions of labor law policy generally are instructive. For an analogy, and to determine national labor policy, it is appropriate to refer to the NLRA for assistance in construing the RLA. Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 383-84, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969).
 
 
 30
 The principal question with respect to the primary strike is whether the contract provision by which the union agreed not to strike military flights, even after RLA dispute mechanisms had been exhausted, is enforceable by injunctive relief. Decision of this question requires an analysis of the dispute resolution mechanisms of the RLA. The RLA provides that "minor disputes" are to be resolved by binding arbitration. A second set of procedures is designed to facilitate a voluntary agreement of the parties in major disputes. See Elgin, J. & E. Ry. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); O'Donnell v. Wien Air Alaska, Inc., 551 F.2d 1141 (9th Cir. 1977). The minor disputes provisions
 
 
 31
 contemplate( ) the existence of a collective agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case.
 
 
 32
 Elgin, supra, 325 U.S. at 723, 65 S.Ct. at 1290. The major disputes provisions relate to disputes over the formation of collective agreements or efforts to secure them. The Act's procedures for major disputes have been described as follows:
 
 
 33
 A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services sua sponte if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place however, only if both consent. § 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. While the dispute is working its way through these stages, neither party may unilaterally alter the status quo. § 2 Seventh, 5 First, 6, 10.
 
 
 34
 Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., supra, 394 U.S. at 378, 89 S.Ct. at 1115.
 
 
 35
 In general, when a contract provision is opened to negotiation, the provision is not kept in effect by operation of the RLA once the procedures for major dispute resolution are exhausted. To encourage voluntary settlement of major disputes, the RLA postpones the time for self-help remedies. However, if after reasonable efforts the parties have exhausted the bargaining procedures specified by the RLA without agreement, the statute does not bar such remedies, including a strike.
 
 
 36
 For (the) settlement (of major disputes) the statutory scheme retains throughout the traditional voluntary processes of negotiation, mediation, voluntary arbitration, and conciliation. Every facility for bringing about agreement is provided and pressures for mobilizing public opinion are applied. The parties are required to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help.
 
 
 37
 Elgin, supra, 325 U.S. at 725, 65 S.Ct. at 1291. See also Jacksonville Terminal Co., supra, 394 U.S. at 379-80, 89 S.Ct. at 1115-16. All concede that the primary strike by the flight attendants did not commence until the major dispute resolution procedures of the Act had been exhausted.
 
 
 38
 We think there can be no question about the meaning of the military no-strike clause in this case. We agree with the conclusions of the district court in this regard. As Judge Peckham stated:
 
 
 39
 The clear import of this provision is to extend the no-strike obligation of the flight attendants beyond the term of the collective-bargaining agreement, even beyond the expiration of the 30-day cooling-off period mandated by the RLA, when the Teamsters would otherwise have the right to strike against all of TIA's operations. The Teamsters do not dispute the meaning of this provision . . .. This military no-strike clause could not be clearer in expressing its intent that the flight attendants thereby give up their right to strike TIA's military flights even during those periods when they might strike all of TIA's other operations.
 
 
 40
 A contrary interpretation would render material portions of the clause meaningless. TIA would not secure the union's promise not to strike military flights after exhaustion of RLA procedures if it were intended that operation of the procedures nullified the obligation. The flight attendants' strike, therefore, violated the military no-strike clause, and resort to minor dispute arbitration is not necessary to reach this conclusion. See Wien, 551 F.2d at 1146-47; Seaboard World Airlines, Inc. v. Transport Workers Union, 425 F.2d 1086, 1090 (2d Cir. 1970).
 
 
 41
 Similarly, we think the Teamsters' strike in violation of their contract obligation did not present a major dispute. In the normal case, once having exhausted major disputes procedures the parties are free to resort to self-help. The military no-strike clause had already been the subject of bargaining in the major disputes sessions. We hold, infra, that, as the parties intended, the clause was binding even after exhaustion of those procedures, but TIA advances no theory by which this fact makes the strike enjoinable as involving a major dispute.
 
 
 42
 We find no authority by which the contract clause in question can be held to violate RLA policies. Once major dispute procedures are completed and the different pressures put on the parties to achieve voluntary settlements have been exhausted, it is true that ordinarily the employer and the union are free to resort to the traditional economic weapons. Brotherhood of Locomotive Engineers v. Baltimore & O. R.R., 372 U.S. 284, 291, 83 S.Ct. 691, 695, 9 L.Ed.2d 759 (1963) (per curiam); Elgin, supra. The RLA does not, however, preclude the parties from adopting a different procedure by contract. Cf. Mastro Plastics Corp. v. NLRB, 350 U.S. 270, 279-84, 76 S.Ct. 349, 356-59, 100 L.Ed. 309 (1956).[7]
 
 
 43
 Whatever the limitations may be on the extent of damages properly awarded in an action at law, see note 9 infra, a question we do not reach here, we perceive no policies peculiar to the RLA which prohibit the parties from regulating by contract their post-major disputes relations in the manner they have here. It is true that ordinarily a union's promise not to strike is accompanied by a promise that the employer agrees to submit the dispute to binding arbitration. The parties have not directed our attention, however, to cases requiring an arbitration clause as a condition to holding the no-strike promise binding.
 
 
 44
 A determination that the military no-strike clause is valid and not contrary to RLA policies does not control the ultimate question whether the contract clause may be enforced by injunctive relief. The anti-injunction command of the Norris-LaGuardia Act may operate independently to bar an injunction notwithstanding the validity of the contract clause to be enforced, and we rule the injunctive power of the federal court may not be used to enforce the no-strike clause here.
 
 
 45
 If this case arose under the NLRA, an injunction would not be granted. See Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 404-12, 96 S.Ct. 3141, 3146-50, 49 L.Ed.2d 1022 (1976) id. at 424 n.15, 426 n.20, 96 S.Ct. at 3155 n.15, 3156 n.20 (dissent); Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). As the Court in Buffalo Forge stated:
 
 
 46
 "(T)here is no general federal anti-strike policy; and although a suit may be brought under § 301 against strikes which, while they are breaches of private contracts, do not threaten any additional public policy, in such cases the anti-injunction policy of Norris-LaGuardia should prevail."
 
 
 47
 428 U.S. at 409, 96 S.Ct. at 3148, quoting Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 225, 82 S.Ct. 1328, 1344, 8 L.Ed.2d 440 (1962) (dissent). If we were persuaded that a substantial purpose unique to the RLA, or protection of its dispute settlement mechanisms, would be substantially furthered by specific enforcement of the clause, we would sustain the order for injunctive relief, but no such conditions exist here.
 
 
 48
 We do acknowledge that there are some considerations which make an injunction appear appropriate in this case, although for reasons stated below we do not find them dispositive. Enforcement of a no-strike clause may have a salutary effect on labor relations, since the employer presumably will consent to a contract for a shorter term in return for a no-strike clause enforceable by an injunction, which reduces the risks inherent in renegotiating the contract. Frequent negotiation, under this view, furthers industrial stability by permitting more precise adjustments to meet changing economic conditions.
 
 
 49
 Further, the breach of contract in this case is plain and unambiguous. One might argue that unambiguous contract breaches could be enjoined without doing violence to any Norris-LaGuardia Act policy. See Note, The Applicability of Boys Markets to Refusals to Cross a Picket Line, 76 Colum.L.Rev. 113, 136-41 (1976). Cf. Buffalo Forge, supra, 428 U.S. at 416-17, 96 S.Ct. at 3151-52 (dissent) (purpose of Norris-LaGuardia Act is to protect labor organizing and ability to bargain collectively, not to prohibit enforcement of collective bargaining agreements); F. Frankfurter & N. Greene, The Labor Injunction 5-46 (1930); Smith, The Supreme Court, Boys Markets Labor Injunctions, and Sympathy Work Stoppages, 44 U.Chi.L.Rev. 321, 341 (1977).
 
 
 50
 Moreover, in this case the military no-strike clause was directed to the discrete transportation function of military flights, the union retaining the right to strike other TIA flights. In addition, apparently the federal government insisted that the company insert the clause as a condition of obtaining military contracts. The no-strike clause therefore furthered specific government transportation interests.[8]
 
 
 51
 Finally, the RLA contains a statutory provision requiring the parties to a contract to maintain their agreement without breach. 45 U.S.C. § 152 First provides:
 
 
 52
 It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.
 
 
 53
 The Supreme Court in Chicago & N.W. Ry. v. United Transportation Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971), held that this section imposed a substantive duty on parties, enforceable by injunctive relief, to exert reasonable efforts during the negotiating process to reach an agreement. More to the point, the duty to maintain agreements was found a basis for injunctive relief in Seaboard World Airlines, Inc. v. Transport Workers Union, 425 F.2d 1086 (2d Cir. 1970), reaff'd in further consideration, 443 F.2d 437 (2d Cir. 1971), and Southern Pacific Transportation Co. v. Railway & Steamship Clerks, 81 Lab.Cas. (CCH) P 13,113 (N.D.Cal.1975). The Second Circuit in Seaboard permitted an injunction to prohibit a strike in violation of the union's contractual promise not to reopen certain subjects for RLA major disputes bargaining before a given date.[9]
 
 
 54
 The difficulty in relying on the above considerations to justify injunctive relief is that, with the exception of the language in section 152, all of these factors if present in a case arising under the NLRA would be insufficient to permit an injunction to issue. The result contended for by TIA and Judge Wallace in his thoughtful opinion would mean that a federal court has radically different powers to Enjoin a strike which clearly violates language in the collective bargaining agreement, depending on whether the controlling statute is the NLRA or the RLA. Admitting the different genesis of the RLA, see Chicago River, supra at 31-32 n. 2, we do not think the statutory policies are sufficiently distinct to justify such different application of the Norris-LaGuardia Act's anti-injunction mandate. Absent a substantial nexus with statutory dispute settlement mechanisms or an agreement to arbitrate, an injunction may not issue to prevent a plain breach of a no-strike clause by a union. The language of section 152 is perhaps unique to the RLA. The history of the RLA, nevertheless, prevents us from finding in the Act's obligation to "maintain agreements" a broad mandate to enjoin all, or even plain, breaches of collective bargaining agreements by a union. Without question, the RLA was a response to the perceived dangers of disruption in the transportation industry. This history has been described elsewhere and need not be repeated here. See Chicago & N.W. Ry., supra, 402 U.S. at 574-84, 91 S.Ct. at 1733-39; Chicago River, supra, 353 U.S. at 40, 77 S.Ct. at 640; Elgin, supra, 325 U.S. at 724-27, 65 S.Ct. at 1290-92; Wien, supra, 551 F.2d at 1145-46. The important point is that Congress responded to these concerns by implementing a comprehensive system of binding arbitration and mandatory nonbinding mediation involving drawn-out procedures designed to encourage parties to reach agreement. The policy of the statute is not that any act which disrupts the transportation industry may be enjoined. Instead, after major disputes procedures are completely exhausted, with reasonable efforts having been made to reach an agreement, see Chicago & N.W. Ry., supra, the policies peculiar to the RLA are also exhausted, and the parties are governed by general labor law principles. The Norris-LaGuardia Act was passed to limit our role in enforcing labor contracts, in part because of mistakes of the past and in part, perhaps, for fear that personal bias sometimes difficult to detect even in ourselves will weigh too heavily in the enforcement process. See, e. g., Chicago River, supra, 353 U.S. at 40-41, 77 S.Ct. at 640-641; F. Frankfurter & N. Greene, supra. Congress has mandated the courts not to alter through injunctions the economic balance between employers and unions without a weighty statutory reason for doing so.[10] The RLA plan for avoiding disruption is not threatened by the flight attendants' strike, and a proper accommodation between the Norris-LaGuardia Act and the NLRA, as determined by the Supreme Court, prohibits enjoining the Teamsters' strike; therefore, the strike in this case may not be enjoined. See generally Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., supra, 394 U.S. at 374-93, 89 S.Ct. at 1113-24 "(P) arties who have unsuccessfully exhausted the Railway Labor Act's procedures for resolution of a major dispute (may) employ the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law." Id. at 392, 89 S.Ct. at 1123.
 
 
 55
 Seaboard does not require a different result. There the court held that a section 6 notice does not open all possible subjects for bargaining between the parties if they have contracted otherwise, and that the parties may agree beforehand not to reopen certain issues when the rest of the collective bargaining agreement comes up for renegotiation pursuant to section 6. Its reasoning does not support TIA's view of section 152. Seaboard involved the effect of contractual efforts to limit the scope of a section 6 proceeding, instead of efforts to specify permissible post-mediation measures. Also, unlike the case before us, the injunction in Seaboard enabled the parties to complete required bargaining on all other issues subject to a section 6 notice, and thus pursue dispute settlement procedures not yet exhausted.
 
 
 56
 Chicago & N.W. Ry. similarly does not support enjoining a primary strike for the purpose of enforcing a clause in the collective bargaining agreement. The rationale for the injunction in that case was that the union had failed to use reasonable efforts to comply with the mandatory disputes settlement mechanisms that lie at the heart of the Act. The integrity of these mechanisms was thus protected by the injunction in Chicago & N.W. Ry. ; enjoining the Teamsters' primary strike in this case would not similarly further the RLA's arbitration policies. We do not think Chicago & N.W. Ry. is authority for abandoning the Norris-LaGuardia Act's anti-injunction provisions whenever a union subject to the RLA has plainly violated its collective bargaining agreement.
 
 
 57
 It might appear anomalous that if a no-strike clause in force during the life of the contract was ambiguous as to whether the strike was permitted, the strike could be enjoined pending the outcome of minor dispute arbitration, and an arbitrator's determination that the strike should stop could be enforced in federal court by an injunction, see Order of Ry. Conductors & Brakemen v. Spokane P. & S. R.R., 366 F.2d 99, 102 (9th Cir. 1966), cert. denied, 385 U.S. 1025, 87 S.Ct. 752, 17 L.Ed.2d 673 (1967) (RLA); Steelworkers v. Enterprise Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (NLRA), but that where the breach is so clear that arbitration is not necessary to determine the violation, no injunction may issue. This result, however, is compelled by the combination of the manner in which Congress and the RLA chose to reduce disruption in the transportation industry, and the controlling interpretations of the Norris-LaGuardia Act. Judge Wallace, dissenting in part, contends that he "can see little practical difference between an injunction enforcing the arbitrator's decision that a strike was forbidden by the contract, despite an underlying major dispute, and an injunction in support of a judicial determination that an anti-strike provision is not only clear, but also valid and binding under the Act." Dissent slip op. at 7 (footnote omitted). Yet this is precisely the distinction which the Supreme Court adopted in the very case cited by Judge Wallace, Buffalo Forge. See 428 U.S. at 404-12, especially at 409.
 
 
 58
 The second principal issue on this appeal is the authority of the district court to enjoin any aspect of the sympathy strike. The district court held that it could enjoin only the sympathy strike directed against military flights. Trans International Airlines, Inc. v. International Brotherhood of Teamsters, 439 F.Supp. 184 (N.D.Cal.1977). We think the district court had jurisdiction to enjoin the sympathy strike in its entirety.
 
 
 59
 Differences among the contracts of the premerger TIA flight engineers and pilots, the former Saturn flight engineers, and the former Saturn pilots, bear on the issues addressed below, and we set forth relevant portions of the contracts in the margin.[11] The controlling collective bargaining agreements between the carrier and the flight engineers and pilots, both with premerger TIA employees and former Saturn employees, contained a no-strike clause and a military no-strike clause, and the question whether the sympathy strike was in violation of the contracts presents a minor dispute under the Act. Both TIA and the Teamsters agree that the dispute must be resolved through the Act's binding arbitration procedures for minor disputes. We cannot say that either TIA's or the Teamsters' interpretation of the contracts are completely without merit. Interpretation of the collective bargaining agreements with respect to the sympathy strike is therefore in the first instance a matter for the adjustment board rather than a court. The question presented for our decision is whether the flight engineers and pilots are required to resort to the minor dispute mechanisms of the Act to have their rights clarified before engaging in the sympathy strike.
 
 
 60
 The Court in Chicago River, supra, permitted injunctions to be issued, the Norris-LaGuardia Act notwithstanding, when the strike threatened the jurisdiction of the minor dispute arbitrator. Subsequent to Chicago River, the Court also permitted strikes to be enjoined to protect binding arbitration provisions in a collective bargaining agreement arising under the NLRA. Boys Markets v. Retail Clerks, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970) (reversing Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962)). Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), then clarified the Boys Markets case, holding that in NLRA cases the Norris-LaGuardia Act deprived federal courts of jurisdiction to enjoin a sympathy strike, even where the strike is clearly forbidden by a contractual no-strike clause and the parties have agreed to binding arbitration. The Court concluded that the sympathy strike was not "over an arbitrable grievance."
 
 
 61
 Chicago River, arising under the RLA, and Boys Markets, arising under the NLRA, reached parallel results; indeed the later case made specific reference to the principles elaborated in Chicago River. The close relation of those cases does not mean, however, that the injunctive power of the federal courts is coextensive under the two statutes. See Sinclair Refining, supra, 370 U.S. at 210-11, 82 S.Ct. at 1336-37. We conclude that not all of the reasoning of Buffalo Forge applies in RLA cases and that policies unique to the RLA support jurisdiction to enjoin the sympathy strike in this case.
 
 
 62
 A principal goal of the Court in Buffalo Forge was to avoid judicial intrusion on an arbitration form established by contract. The Court pointed to the dangers of judicial declarations that might control an arbitrator's determination of the case, a responsibility assigned exclusively to him by agreement of the parties. See 428 U.S. at 410-12, 96 S.Ct. at 3148-50. The Court refused to conclude, in the absence of express language in the contract, that the parties intended to allow preliminary injunctive relief pending arbitration, where such relief was not necessary to insure arbitration of the dispute. See id. at 411, 96 S.Ct. at 3149. Perhaps the Court was also worried that a contrary result would lead to fewer arbitration clauses in collective bargaining agreements, the unions being less willing to agree to arbitrate disputes or to proceed to arbitration following a preliminary injunction. See id. at 412, 96 S.Ct. at 3149. These considerations are inapplicable here. Congress in the RLA established a process of minor dispute settlement without reference to any arbitration framework which would have been agreed upon by the parties. The permissible prearbitration remedies agreed upon by the parties, and the effect of our decision on the number of minor disputes likely to be settled by arbitration, are not issues presented by this case.
 
 
 63
 Moreover, implementation of the RLA's process for resolving minor disputes is not limited to granting preliminary injunctive relief only where the relief will make it more likely that the dispute will be arbitrated.[12] The requirement of arbitration under the RLA is an essential part of the congressional purpose of avoiding interruption of the transportation industry. Chicago River, supra, 353 U.S. at 40, 77 S.Ct. at 640; Elgin, supra, 325 U.S. at 724-27, 65 S.Ct. at 1290-92; Wien, supra, 551 F.2d at 1145-46. The minor dispute arbitration procedure was designed as a substitute for prearbitration strikes, cf. Chicago River, supra, and we think this includes sympathy strikes of the character presented in this case. See Detroit and T. Shoreline R.R. v. United Transportation Union, 396 U.S. 142, 148, 90 S.Ct. 294, 298, 24 L.Ed.2d 325 (1969); Texas and N.O.R.R. v. Brotherhood of Railway & Steamship Clerks, 281 U.S. 548, 565, 50 S.Ct. 427, 432, 74 L.Ed. 1034 (1930). The legislative history of the RLA suggests an intent to prevent a dispute that involves a small number of transportation workers from disrupting the carrier's existing operations and its relations with other employees. It would be contrary to this objective to permit a sympathy strike before completion of the minor dispute mechanisms for determining the legitimacy of the strike. We therefore reject ALPA's argument that Boys Markets and other related cases declare the policies underlying the use of arbitration to be identical under the NLRA and the RLA.
 
 
 64
 The policy of avoiding disruption of transportation businesses is not, of course, all encompassing. As we held above, a federal court under the RLA may not enjoin a strike plainly in breach of contract where the major disputes mechanisms of the Act have been used and exhausted. The policy is strong enough, however, to require that where a minor dispute exists the union must first establish its contractual right to engage in a sympathy strike before disrupting a carrier's operation, at least where traditional standards governing preliminary relief are met.[13] This does no more than preserve the status quo pending clarification of the parties' rights by statutory procedures. Maintenance of the status quo before and during major dispute procedures is required by the RLA. See Detroit and T. Shoreline R.R., supra ; 45 U.S.C. § 156. Similarly where changes in the status quo are likely to lead to serious harm and threaten to disrupt the operation of the transportation carrier, injunctive relief is proper pending operation of the Act's minor dispute procedures. Maintenance of the status quo is, of course, a traditional basis for equitable relief. See, e. g., Brotherhood of Locomotive Engineers v. Missouri-K.-T.R.R., 363 U.S. 528, 532-35, 80 S.Ct. 1326, 1329-1330, 4 L.Ed.2d 1379 (1960); Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 808-09 (9th Cir.), cert. denied, 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963). Given the special concern of the RLA over continuous operation by carriers, it is appropriate to require the union to accept the status quo pending the arbitrator's decision. See Smith, supra at 340-49. International Association of Machinists v. Street, 367 U.S. 740, 771, 81 S.Ct. 1784, 1801, 6 L.Ed.2d 1141 (1961).
 
 
 65
 The preservation of the status quo is especially proper where failure to grant injunctive relief would make the arbitrator's ultimate decision a meaningless one. This was a consideration in Missouri-K.-T.R.R., supra. Upholding the action of the district court, which issued an injunction against a strike pending resolution of the minor dispute by the settlement mechanisms of the Act, the Court stated:
 
 
 66
 From the point of view of these employees, the critical point in the dispute may be when the change is made, for, by the time of the frequently long-delayed Board decision, it might well be impossible to make them whole in any realistic sense. If this be so, the action of the district Judge, rather than defeating the Board's jurisdiction, would operate to preserve that jurisdiction by preventing injury so irreparable that a decision of the Board in the unions' favor would be but an empty victory.
 
 
 67
 363 U.S. at 534, 80 S.Ct. at 1330.
 
 
 68
 For these reasons we conclude that the district court had jurisdiction to enjoin the sympathy strike, in its entirety, pending determination of the contractual rights of the parties by the adjustment board.
 
 
 69
 Although the district court had jurisdiction to enjoin the sympathy strike in its entirety, in light of the principles discussed in our opinion, relevant differences in the contract provisions of different groups of TIA employees may not have been considered as they should have been by the district court. In addition to the general and military no-strike clauses, the contract of the premerger TIA flight engineers and pilots contains a "picket line" clause which seems to permit the honoring of other employees' legal picket lines. Although the clause probably does not apply to the sympathy strike in this case,[14] the language would be a factor to consider in weighing the likelihood of the employer ultimately succeeding in its claim.[15]SUMMARY
 
 
 70
 As to the primary strike, the order enjoining the strike of military flights is reversed and the order declining to enjoin the strike of nonmilitary strikes is affirmed.
 
 
 71
 As to the sympathy strike, the trial court's ruling that it had jurisdiction to enjoin the strike of military flights is affirmed. If the strike were still in force we would remand this aspect of the case to the trial court for further consideration of the propriety of the injunction in view of our discussion of Buffalo Forge, the RLA, and the standards for granting injunctive relief in this situation. The strike having ended, however, such further proceedings are not required. The order of the district court declining to enjoin the sympathy strike of nonmilitary flights on the ground of lack of jurisdiction is reversed.
 
 
 72
 Because of the contempt proceedings pending in the district court, a remand is appropriate. The pre-merger TIA engineers were represented by the Teamsters, and the agreement quoted in footnote 11 was in force when the district court issued its injunctions and contempt orders in this case. The trial court will consider the question of the legal rights of the parties for the alleged contempt in light of the principles set forth herein, together with such other considerations as it may deem appropriate to a just determination of the case.
 
 
 73
 The orders of the district court are AFFIRMED in part, REVERSED in part, and the case REMANDED for further proceedings.
 
 
 74
 The parties shall bear their own costs for the appeals taken to this court.
 
 WALLACE, Circuit Judge, dissenting in part:
 
 75
 I dissent from that part of the majority's decision which reverses the district court's injunction order against the primary strike activity directed at military flights. Although I am mindful of the post-impasse setting of this labor dispute and the general policies favoring the free play of economic forces when parties fail to reach agreement, I believe that this is one of those occasions when the general policies of the Norris-LaGuardia Act should give way to important countervailing policies embodied in the central provisions of the Railway Labor Act (RLA).
 
 
 76
 * It has long been recognized "that Norris-LaGuardia does not invariably bar injunctive relief when necessary to achieve an important objective of some other statute in the pattern of labor laws." Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 217, 82 S.Ct. 1328, 1340, 8 L.Ed.2d 440 (1962) (Brennan, J., dissenting). Specifically, the Supreme Court has held on several occasions that the anti-injunction policy of Norris-LaGuardia will be overcome by the need to enforce a statutory duty arising under the RLA. See, e. g., Chicago & N. W. Ry. v. United Transp. Union, 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); Brotherhood of R. R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); Graham v. Brotherhood of Locomotive Firemen & Enginemen, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22 (1949). The Court has stated that "the propriety of judicial enforcement (under the RLA) turns on the importance of the duty in the scheme of the Act, the capacity of courts to enforce it effectively, and the necessity for judicial enforcement if the right of the aggrieved party is not to prove illusory." Chicago & N. W. Ry. v. United Transp. Union, supra, 402 U.S. at 578, 91 S.Ct. at 1736. See also International Ass'n of Machinists v. Street, 367 U.S. 740, 772-73, 81 S.Ct. 1784, 1801-02, 6 L.Ed.2d 1141 (1961).
 
 
 77
 There is no question that, in general, the RLA is designed to avoid interruption of commerce by channeling the parties through various procedures designed to enhance the chances for agreement. As the majority observes, normally the exhaustion of the major dispute processes of the RLA frees the parties to flex their economic muscle. See Brotherhood of R. R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 392, 89 S.Ct. 1109, 1123, 22 L.Ed.2d 344 (1969). For these reasons, an injunction in this setting must be justified by important considerations.
 
 
 78
 The majority acknowledges that the RLA does not preclude the parties from supplementing the statutory scheme by contract. Moreover, the majority has sustained the contract provision before us as consistent with the overall approach of the RLA. It is my view that the policies of the RLA are not exhausted when, as here, the parties have made clear provision for such a limitation on the weapons available in their own bargaining process. Nor am I persuaded that Trans International Airlines (TIA) should be denied its bargain on the sole ground that the dispute, though involving a contract term and to that extent being in the nature of a minor dispute, occurred in a post-mediation setting of an underlying major dispute. The pointed limitation included in the statement of the Supreme Court relied on by the majority is of great importance:
 
 
 79
 parties who have unsuccessfully exhausted the Railway Labor Act's procedures for resolution of a major dispute (may) employ the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law.
 
 
 80
 Brotherhood of R. R. Trainmen v. Jacksonville Terminal Co., supra, 394 U.S. 369, 392, 89 S.Ct. 1109, 1123, 22 L.Ed.2d 344 (emphasis added). I have concluded that the use of such power in this case does conflict with an important obligation under the RLA.
 
 
 81
 It is my view that this case should be governed by the reasoning set forth in Seaboard World Airlines v. Transport Workers Union, 425 F.2d 1086 (2d Cir. 1970). In Seaboard, the Second Circuit upheld an injunction of a strike called to pressure an employer into bargaining over topics not subject to reopening under the existing collective bargaining agreement. The court found that the union's attempt to breach the moratorium agreement amounted to a violation of its duty under section 2 First of the RLA "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier . . . ." (Emphasis added.) See id. at 1091. It is the violation of this same duty to maintain agreements which TIA invokes as the ground for the injunction in this case.
 
 
 82
 Although the majority does not find Seaboard to be dispositive, I believe that the problem presented there is analogous to the one we face. In each setting, the relevant contract provision was intended to block the union from pursuing its grievances by means of economic pressure on the employer in Seaboard, by forbidding the giving of a section 6 notice that would set in gear the major dispute procedures of the RLA; in the case before us by forbidding strike pressure against military flights even after the exhaustion of those procedures.[1] In each case, the union's primary defense was that the contract term was somehow inconsistent with the overall purposes of the RLA and hence inapplicable; Norris-LaGuardia's restrictions on injunctive relief provided the union's fallback position. In each setting, a strike injunction could have issued pending the RLA's mandatory arbitration procedures,[2] were it not for the fact that the minor dispute questioned the statutory validity of the contract provision rather than its intended meaning. See id. at 1090 (citing Felter v. Southern Pacific Co., 359 U.S. 326, 327-28, 79 S.Ct. 847, 850-51, 3 L.Ed.2d 854 (1959)).[3] The court in Seaboard reasoned, in part, that unions should not be free to strike in violation of contract terms pending resolution of the controversy merely because those terms are so clear as not to require the mandatory arbitration of the Act:
 
 
 83
 From a practical standpoint we can see little difference between an anti-strike injunction pending interpretation by a board of adjustment whether a contract allowed reopening, as was approved in Flight Engineers' Int'l Ass'n v. American Airlines, Inc., . . . 303 F.2d 5 ((5 Cir. 1962)), and an injunction pending determination by a court whether a prohibition on reopening is illegal.
 
 
 84
 Id. at 1092. Similarly, I can see little practical difference between an injunction enforcing the arbitrator's decision that a strike was forbidden by the contract, despite an underlying major dispute, see Buffalo Forge Co. v. United Steelworkers, AFL-CIO, 428 U.S. 397, 405, 96 S.Ct. 3141, 3146, 49 L.Ed.2d 1022 (1976) (NLRA), and an injunction in support of a judicial determination that an anti-strike provision is not only clear, but also valid and binding under the Act.[4]
 
 
 85
 The majority does not disapprove of Seaboard's holding, nor does it appear to deny that the union in the case before us has breached its duty to exert reasonable efforts to "maintain agreements." The majority's main effort to distinguish the case amounts to restating the acknowledged fact that Seaboard involved the effect of contractual efforts to preclude a section 6 proceeding rather than efforts to specify permissible post-mediation measures. But this distinction does not explain why the union activity in Seaboard should constitute a more significant breach of the statutory duty to "maintain agreements" than occurred here, nor why injunctive relief was more appropriate there.[5] While the postmediation setting is not irrelevant, the fact that a minor dispute is also involved suggests that this distinction may not be decisive. The majority appears to conclude otherwise primarily by finding that only the violation of statutory duties bearing a "substantial nexus" to statutory dispute settlement procedures represent a "weighty statutory reason" for abrogating Norris-LaGuardia. See ante at 962. I turn next to that contention.
 
 II
 
 86
 The Supreme Court has never stated that the only RLA duties important enough to justify injunctive relief despite Norris-LaGuardia are those that directly support dispute settlement procedures laid down by the Act. In fact, a number of leading Supreme Court decisions involve breach of the duty of fair representation of minority workers which the Court found implicit in the Act's overall scheme, a duty that does not directly support the Act's procedures for dispute resolution. See, e. g., Graham v. Brotherhood of Locomotive Firemen & Enginemen, supra, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22. The majority thus incorrectly asserts that reversal is "compelled by the combination of the manner in which Congress and the RLA chose to reduce disruption in the transportation industry, and the controlling interpretations of the Norris-LaGuardia Act." See ante at 964. There simply is no controlling precedent in this case and we are thus forced to reconcile the demands of the RLA and Norris-LaGuardia.
 
 
 87
 Equally important, several prior cases upholding strike injunctions under the RLA can be adequately explained only by the general RLA policy of avoiding needless disruption of commerce and a corresponding policy of restricting the right to use economic pressure in a minor dispute. Such decisions, including our decision to reverse the district court's refusal to enjoin the sympathy strike against non-military flights, are not unrelated to the RLA's machinery for resolving disputes, but, at the same time, are not directly supportive of that machinery.
 
 
 88
 For example, in Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957), the Supreme Court held that strikes could be enjoined pending the completion of the minor dispute procedures of the RLA. The Court stressed that strikes might force employers to succumb prior to the Adjustment Board's decision, thereby effectively depriving the Board of jurisdiction. Id. at 39, 77 S.Ct. at 639. See also Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 252, 90 S.Ct. 1583, 1593, 26 L.Ed.2d 199 (1970). This reasoning explains the result in Chicago River, where the Court considered "controversies over the meaning of an existing collective bargaining agreement in a particular fact situation, generally involving only one employee," 353 U.S. at 33, 77 S.Ct. at 636, but it does not explain the application of the Chicago River doctrine to factual settings in which the underlying grievance will not be resolved by the arbitration in support of which injunctive relief is sought. The sympathy strike before us, the enjoining of which the majority affirms, involves an entire unit of employees refusing to cross the picket line of sister employees engaged in a post-mediation primary strike. Since the only arbitrable issue is the contractual legality of the strike itself, these employees are not merely required to resolve the underlying dispute in accordance with the statutory scheme, but are precluded from using their most effective weapon pending resolution of the strike issue itself. The decision to enjoin thus preliminarily resolves the merits of the minor dispute over the applicability of the strike clause, arguably in derogation of the Adjustment Board's jurisdiction over that issue.
 
 
 89
 It was precisely the limited and indirect nature of the relationship between sympathy strikes and the efficacy of a system of arbitration as the means of resolving disputes, that led the Supreme Court to limit the rule of Boys Markets to injunctions against strikes "over an arbitrable grievance." Buffalo Forge Co. v. United Steelworkers, AFL-CIO, supra, 428 U.S. at 407-08, 96 S.Ct. at 3147-48. The majority distinguishes Buffalo Forge, correctly I believe, by finding that "the minor dispute arbitration procedure (of the RLA) was designed as a substitute for prearbitration strikes." See ante at 966. Whereas under the NLRA the judicial role involves aiding private parties to resolve their disputes, which necessarily focuses concern on whether a particular rule may discourage parties from agreeing to arbitrate, the judicial role under the RLA involves the implementation of a statutory policy requiring the parties to use reasonable efforts to avoid disruption of commerce. The arbitration scheme is thus read to mean that there is no unqualified "right to strike" in a minor dispute setting, at least where traditional standards of equity are met. The traditional presumption that labor may use its full economic power gives way to a statutory scheme that avoids disruption of commerce by requiring the parties with an established relationship to settle minor disputes without resort to such power.
 
 
 90
 Despite its post-mediation setting, the union's strike against military flights also involves a minor dispute. That dispute should be resolved before the economic power of the parties is unleashed. The majority acknowledges the anomaly that if a no-strike clause in force during the life of the contract was ambiguous, a strike could be enjoined pending the outcome of minor dispute arbitration. But the anomaly runs even deeper, for if the union had made a colorable claim that the contract clause before us did not intend to preclude post-mediation strikes, the strike could also have been enjoined pending arbitration even in its current setting. See note 2 supra. It is difficult to see why the availability of injunctive relief should turn exclusively on the clarity of the contract provision in question. Under these circumstances, the union should not be allowed to evade its contractual obligation simply by claiming it is invalid under the statute rather than not required by the contract. Thus, this situation presents an appropriate occasion for judicial enforcement of the duty contained in section 2 First of the RLA.
 
 III
 
 91
 Having concluded that Norris-LaGuardia may give way to the need to enforce an important statutory duty, and that the duty to be enforced may be one that lends support to the statute's policy against disruption of commerce when there exists a minor dispute under the RLA, I turn now to several additional factors which persuade me that an injunction is appropriate here.
 
 A.
 
 92
 I disagree with the majority's conclusion that upholding the injunction order here would grant courts a general power to police contracts under the RLA.[6] In the first place, courts will almost always lack jurisdiction to do so because of the Adjustment Board's exclusive jurisdiction over disputes concerning the meaning of a contract. Moreover, since the section 2 First duty requires only "reasonable efforts" to "maintain agreements," it is doubtful that courts would find the breach of that duty where good faith disagreements over the meaning of a contract existed. Thus, there is little chance that courts would employ that duty as an excuse for preliminarily resolving disputes between the parties pending arbitration.
 
 
 93
 I also disagree with the majority's conclusion that one of the underlying purposes of Norris-LaGuardia was to limit the role of courts in enforcing labor contracts. See ante at 963. In Chicago River, supra, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, which the majority relies on for this assertion, the Supreme Court stated that Norris-LaGuardia was designed to correct the abuses that came when federal courts were "drawn into the field (of enjoining union activities) under the guise either of enforcing federal statutes, principally the Sherman Act, or through diversity of citizenship jurisdiction." Id. at 40, 77 S.Ct. at 640. The abuses under diversity jurisdiction came about not through judicial construction of collective bargaining agreements, but because of "the tendency of judges to enjoin concerted activities in accordance with 'doctrines of tort law which made the lawfulness of a strike depend upon judicial views of social and economic policy.' (Citation omitted.)" Boys Markets, Inc. v. Retail Clerks Union, supra, 398 U.S. at 253 n. 22, 90 S.Ct. at 1593 (quoting Report of Special Atkinson-Sinclair Committee, A.B.A. Labor Relations Law Section Proceedings 226, 242 (1963)). On the other hand, "(w) here an injunction is used against a strike in breach of contract, the union is not subjected in this fashion to judicially created limitations on its freedom of action but is simply compelled to comply with limitations to which it has previously agreed." Id. Ironically, the majority elsewhere acknowledges the plausibility of the argument that courts might enjoin unambiguous contract breaches without doing violence to any Norris-LaGuardia policy. See ante at 959.
 
 
 94
 It is true, of course, that the Supreme Court has not read Taft-Hartley's section 301 jurisdiction as repealing Norris-LaGuardia as to disputes over the rights of parties under a collective bargaining agreement. The Court refused to do so largely because "(i)n the course of enacting the Taft-Hartley Act, Congress rejected the proposal that the Norris-LaGuardia Act's prohibition against labor-dispute injunctions be lifted to the extent necessary to make injunctive remedies available in federal courts for the purpose of enforcing collective bargaining agreements." Buffalo Forge Co. v. United Steelworkers, AFL-CIO, supra, 428 U.S. at 409, 96 S.Ct. at 3148. Nevertheless, as the majority acknowledges, labor relations under the RLA developed along different lines than in other industries, and "(t)he fundamental premises and principles of the (RLA) are not the same as those which form the basis of the (NLRA) . . . ." Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R., supra, 353 U.S. at 31-32 n. 2, 77 S.Ct. at 636.
 
 
 95
 While I do not argue that Norris-LaGuardia is broadly repealed in every controversy relating to a collective bargaining agreement under the RLA, I am persuaded that, under these facts at least, it is appropriate to enjoin the union's clear breach of its contractual obligation. The union's violation of its statutory duty to "maintain agreements" takes this case outside the ambit of the Court's oft-repeated statement that "although a suit may be brought under § 301 against strikes which, while they are breaches of private contracts, do not threaten any additional public policy, in such cases the anti-injunction policy of Norris-LaGuardia should prevail." Buffalo Forge Co. v. United Steelworkers, AFL-CIO, supra, 428 U.S. at 409, 96 S.Ct. at 3148 (quoting Sinclair Refining Co. v. Atkinson, supra, 370 U.S. at 225, 82 S.Ct. at 1344 (Brennan, J., dissenting)) (emphasis added). Like other statutory duties under the RLA, the violation of section 2 First does threaten an "additional public policy" and is thus enjoinable.
 
 B.
 
 96
 I also disagree with the majority's conclusion that the policy of allowing the free play of economic forces in the post-mediation setting is unduly compromised by the district court's injunction. It should first be observed that the policy is not absolute. The majority acknowledges that the Supreme Court has sanctioned the enjoining of a post-mediation strike by a union which has violated its section 2 First duty "to exert reasonable efforts to make and maintain agreements" during the negotiating process. Chicago & N.W. Ry. v. United Transp. Union, supra, 402 U.S. at 571, 91 S.Ct. at 1732. Similarly, it is probable that a strike-injunction could issue pending the outcome of the binding arbitration required by the RLA's minor dispute provisions, even in a post-mediation setting. Finally, as the majority acknowledges, an injunction may issue to enforce an agreement by the parties to submit a major dispute to binding interest arbitration after the mechanisms of the Act are exhausted.
 
 
 97
 If a union may be compelled to honor its agreement to forego completely the use of economic weapons pending interest arbitration consistent with the policies underlying the RLA and Norris-LaGuardia, it is not clear why they cannot be compelled to honor their commitment to limit the use of such weapons consistent with a narrowly tailored contract provision and their responsibility under section 2 First of the RLA. Indeed, I am convinced of the propriety of this injunction order in part because, like the examples alluded to above, an injunction here would constitute a very narrow exception to the general policy of permitting strikes when negotiations have failed to produce agreement. Allowing an injunction here would not "provide a cover for freewheeling judicial interference in labor relations of the sort that called forth the Norris-LaGuardia Act in the first place." Id. at 583, 91 S.Ct. at 1738.
 
 
 98
 It is significant that, as the majority observes, "in this case the military no-strike clause was directed to the discrete transportation function of military flights, the union retaining the right to strike other TIA flights." See ante at slip. op. 2055. Specific enforcement of the duty to maintain agreements in this setting does not, like the labor injunctions which led to passage of Norris-LaGuardia, leave the union without alternatives for pressing its demands. Cf. Brotherhood of R.R. Trainmen v. Chicago River & Ind. R.R., supra, 353 U.S. at 41, 77 S.Ct. at 640 (injunction pending outcome of arbitration justified in part because it does not strip labor of its primary weapon without substituting any reasonable alternative). The determination whether section 2 First would sustain an injunction against breach of a provision forbidding all strike activity even after mediation has failed to produce agreement may await a later case. See Seaboard World Airlines v. Transport Workers Union, supra, 425 F.2d at 1091 (emphasizing that its determination of the propriety of injunctive relief involved a spectrum, but finding such relief in that case "still . . . withdrawn from the prohibitions of the Norris-LaGuardia Act").
 
 C.
 
 99
 Finally, in reconciling the policies of Norris-LaGuardia and the RLA, I would put considerable weight on the unique and important governmental interest in avoiding disruption of military flights. This contract provision was required as a condition for obtaining military contracts, reflecting the federal government's belief that such a provision has significance for the nation's security. Here we are dealing with interests that, in a time of emergency, can be essential to our nation's survival. When the union's strike activity clearly violates a contract provision designed to prevent disruption of such a vital part of the nation's military transportation system, an object which goes to the heart of the concerns that distinguish the RLA in the scheme of the nation's labor laws, it behooves us to consider carefully whether section 2 First may not adequately support judicial efforts to see that such a clause is not blatantly ignored.
 
 
 100
 Under these circumstances I would affirm.
 
 ORDER
 
 101
 The panel as constituted in the above case has voted to deny the petition for rehearing and to reject the suggestion for a rehearing en banc.
 
 
 102
 The full court has been advised of the suggestion for en banc rehearing, and no judge of the court has requested a vote on the suggestion for rehearing en banc. Fed.R.App.P. 35(b).
 
 
 103
 The petition for rehearing is denied and the suggestion for a rehearing en banc is rejected.
 
 
 104
 In response to the petition for rehearing, Judge Goodwin files the following statement:
 
 
 105
 I would modify the majority opinion to hold that a sympathy strike is a major dispute if the work stoppage with which the sympathy strike is allied is a major dispute. I do not read the Railway Labor Act cases as extending to major disputes the power to enjoin.
 
 
 
 [1]
 Although we ultimately hold that the Norris-LaGuardia Act deprives the federal courts of jurisdiction to enjoin the primary strike in this case, federal question jurisdiction is conferred by 28 U.S.C. §§ 1331 & 1337, since the enforceability of the contract clauses at issue and the propriety of granting injunctive relief arise under the various sections of RLA, 45 U.S.C. §§ 151 et seq
 
 
 [2]
 The Teamsters and ALPA stand in the same position with regard to the sympathy strike issues addressed below. Where appropriate, we use "Teamsters" or "the Union" to refer to ALPA as well as the Teamsters
 
 
 [3]
 The relevant contract provisions provide:
 ARTICLE XII
 No Strike No Lockout
 Section A. During the term of this Agreement, the Union shall not authorize, cause, sanction or engage in any strike, picketing, slowdown or stoppage of work.
 Section B. During the term of this Agreement, the Company shall not cause, permit, or engage in any lockout of its Flight Attendants.
 Section C. During the term of this Agreement, the Company reserves the right to discharge or otherwise discipline any Flight Attendant taking part in any strike, picketing, slowdown or stoppage of work.
 Section D. The Union further agrees that the Flight Attendants will continue to perform all duties which are necessary to enable the Company to operate flights for or in support of traffic sponsored by the Department of Defense of the United States of America, even though such Flight Attendants withdraw from commercial airline service because of a dispute arising out of negotiations for a new contract after the expiration date of this Agreement and/or during and after all procedures of the Railway Labor Act have been exhausted, provided the Company shall submit to the Union, when requested, proof that a particular flight is being flown or operated under charter or contract to the Department of Defense.
 
 
 [4]
 The contracts between TIA and its flight attendants, engineers, and pilots contain the same military no-strike clause which is discussed at greater length below
 
 
 [5]
 Moreover, even were there no possibility of damages recovery in the further district court proceedings, this appeal probably would not be moot under the "capable of repetition, yet evading review" standard as elaborated in recent cases such as Weinstein v. Bradford, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975), Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), and Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), Amalgamated Transit Union v. Greyhound Lines, Inc., 550 F.2d 1237, 1238 n.1 (9th Cir.), cert. denied, 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977), and Bituminous Coal Operators' Association, Inc. v. U. M. W., 585 F.2d 586, 599-600 (3d Cir. 1978). Under these cases, a challenged action is not moot when:
 (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there (is) a reasonable expectation that the same complaining party would be subjected to the same action again.
 The first prong of this test is met, as this strike ended before its legality could be fully litigated. As the Court has noted, "(T)he great majority of economic strikes do not last long enough for complete judicial review of the controversies they engender." Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 126, 94 S.Ct. 1694, 1700, 40 L.Ed.2d 1 (1974).
 There is also a reasonable expectation the same complaining parties will take similar action again. The September, 1977, strike was not the first strike of TIA by the Teamsters. In July of 1974, TIA's flight attendants and flight crewmembers, both represented by the Teamsters, struck TIA. Similarly, Saturn Airways, which merged into TIA, was the object of strikes by its pilots, represented by ALPA, in May of 1972. Saturn's flight engineers, attendants, and navigators, all represented by the Teamsters, struck Saturn again in August of 1974. Saturn secured a court order requiring the striking parties to return to work.
 Further, the actions of TIA in maintaining operations in the face of the strikes in this case were found by the district court to be common methods used by employers, and presumably reasonably likely to be used by TIA in the event of another strike. The Teamsters and ALPA continue to represent some of the groups of employees involved in this lawsuit. Thus the same parties whose conduct is at issue in this suit will continue to face each other across the bargaining table. Moreover, the new contract signed by TIA and the Teamsters on January 12, 1978, contains the same military no-strike clause which is the principal subject of this opinion. Finally, although the bargaining and subsequent strike giving rise to the instant dispute have been settled, the record before us on the issues presented for decision is no less concrete than it would be if the strike were ongoing.
 Our reliance on the potential pending damage liability makes it unnecessary for us to consider whether TIA's failure to request declaratory relief in its original complaint would affect a decision regarding mootness, see Coal Operators, supra, 585 F.2d at 599-600; Japan Air Lines Co. v. International Association of Machinists, 538 F.2d 46, 50-51 (2d Cir. 1976).
 
 
 [6]
 The opinion of the district court was as follows:
 MEMORANDUM AND ORDER RE PILOTS
 The facts of this labor dispute have already been fully set forth in this court's memoranda of September 26 and September 28, 1977. Plaintiff TIA now moves for a preliminary injunction against defendant ALPA regarding TIA's military flights. The matter has been fully heard by the court and has been submitted for decision on the record and pleadings on file.
 The court has heard a substantial amount of testimony regarding TIA's varied and extensive efforts to continue its operations during the current strike in an attempt to defeat the strike. Nevertheless, the court does not feel that TIA's actions, which are all legally permissible and fairly common methods of countering the impact of a strike, are so inequitable as to require the denial of injunctive relief. These parties are engaged in a hard fought labor dispute that unfortunately has resulted in a test of their relative economic strength. In such a situation, it is not unusual or unfair for both sides to resort to all of the weapons legally available to them.
 The court would also like to make note of an additional matter which has come to its attention during these proceedings. The testimony of Mr. Arthur Perkel of the Military Airlift Command (MAC) makes it clear that, without specifically intending to do so, the administration of MAC expansion business will almost inevitably tend to strengthen the economic position of a struck airline, such as TIA, as against its striking employees. The number of airplanes freed by a strike against the airline's commercial flights allows the airline to seek and obtain a greater proportion of the available MAC expansion business. Furthermore, this effect can be greatly magnified if the cooperation of other airlines with MAC contracts can be obtained, as may have been the situation in this case. Although this effect troubles the court in granting this injunction, we do not feel that this matter is one for judicial resolution. Rather, such matters should be taken up with the proper parties within the executive branch, such as the Secretary of Defense and the Secretary of the Air Force.
 Therefore, it is hereby ORDERED that plaintiff's motion for a preliminary injunction with regard to military flights is granted, for the reasons stated herein and in the court's memorandum and order of September 28, 1977. The terms of this preliminary injunction are to be the same as the temporary restraining order of September 28, 1977.
 Counsel for the plaintiff shall prepare a proposed form of judgment. Rule 58, Fed.R.Civ.Pro.
 
 
 [7]
 For instance, nothing in our holding today prevents parties from agreeing to binding arbitration after the major dispute mechanisms of the Act are exhausted
 
 
 [8]
 The Government's transportation interests are protected to some extent by 45 U.S.C. § 160. The Mediation Board may notify the President of disputes which threaten serious disruption, and the President may then create a board to investigate and report respecting the dispute. For the thirty days allowed for the board's work, and for thirty days thereafter, no change in the status quo is permitted except by agreement of the parties
 
 
 [9]
 In Seaboard the parties, by supplemental agreement, had resolved an issue of job security for flight navigators displaced by technological change and it was agreed not to reopen the issue for a period of ten years. The rest of the bargaining agreement came due for reopening at an earlier date. At that date, the union served a section 6 notice which included a request to negotiate the flight navigator question, the very issue put out of reach by the supplemental agreement. When the airline refused to negotiate the issue, the union struck, arguing that the carrier was avoiding its obligations to bargain under the major disputes provision of the Act. The court held that an anti-strike injunction could issue pending resolution by the district court of the question whether the extended prohibition on reopening the particular subject was illegal, and it later affirmed both the district court's conclusion that the clause was legal and its grant of an injunction against similar strikes in the future
 
 
 [10]
 For example, if we were to enforce the military no-strike clause by an injunction, it might be appropriate to limit its duration to a reasonable time, rather than indefinitely. To define a reasonable time for enforcement probably would require a decision as to when hardship on the union becomes so great that the injunction should be lifted so the union can begin punishing the employer for refusal to accede. Whatever might be our powers to make such judgments in damage actions for breach of contract, the Norris-LaGuardia Act was designed to preclude courts from issuing injunctions on this kind of determination
 
 
 [11]
 As a result of the merger in 1976 of TIA and Saturn Airways, at the time of the events in question former Saturn engineers and pilots were governed by a different contract than the premerger TIA engineers and pilots. As we discuss further below, see pages 965-966, differences in contract language between the former Saturn flight engineers and the premerger TIA flight engineers and pilots would bear on the propriety of granting preliminary relief. In relevant part, the contracts provide:
 PRE-MERGER TIA FLIGHT EN- GINEERS AND PILOTS
 (Agreement of July 21, 1974)
 "SECTION 21
 A. (General No Strike Clause) During the term of this Agreement, the Union shall not authorize, cause, sanction or engage in any strike, picketing, slowdown or stoppage of work.
 D. (Military No Strike Clause) The Union further agrees that the Crewmembers will continue to perform all duties which are necessary to enable the Company to operate flights for or in support of traffic sponsored by the Department of Defense of the United States of America, even though such Crewmembers withdraw from commercial airline service because of a dispute arising out of negotiations for a new contract after the expiration date of this Agreement and/or during and after all procedures of the Railway Labor Act have been exhausted, . . . ..
 E. (Picket Line Clause) It shall not be a violation of this Agreement, and it shall not be a cause for discharge or disciplinary action in the event a Crewmember refuses to go through or work behind a legal primary picket line maintained by the Union in connection with a dispute between the Company and the Union involving any flight personnel represented by the Union."
 FORMER SATURN FLIGHT ENGINEERS
 (Agreement of November 17, 1974)
 "Section 24
 L. (General No Strike Clause) The Company will not lock out any employees covered by this Agreement and the Union and its members, individually and collectively, agree that they will not authorize or take part in any strike or picketing at the Company's premises during the life of this Agreement, until the procedures for settling disputes involving employees covered by this Agreement, as provided for by the Railway Labor Act, have been exhausted by both parties.
 P. (Military No Strike Clause) Conduct of Military Operations It is mutually agreed that during the term of the Agreement between the Company and its Flight Engineers as represented by the Union, that the Flight Engineers will not engage in any strike or work stoppage on purely military operations conducted by the Company."
 FORMER SATURN PILOTS
 (Agreement of May 23, 1972)
 This contract contains no general no-strike agreement as such, although it does, in Section 26 C 12, reserve to each party all the rights and privileges accorded under the provisions of the Railway Labor Act.
 "Section 29
 K. (Military No Strike Clause) In the interest of national defense and in the event of the withdrawal from service from Saturn Airways, Inc., of crew members covered by this agreement, essential military services shall be permitted to operate; provided, however, that this policy shall only pertain to those flights that are solely and completely military in nature and whose entire cargo is comprised of military commodities or military personnel."
 
 
 [12]
 The Buffalo Forge result has been explained by some commentators as resting on the insight that enjoining a sympathy strike does not make it more likely that the arbitrable dispute the contractual right to engage in a sympathy strike will be decided by the arbitrator. See, e. g., 63 Cornell L.Rev. 507, 512 n. 29 (1978); Note, The Applicability of Boys Markets to Refusals to Cross a Picket Line, 76 Colum.L.Rev. 113, 131 (1976). As stated in the text, to apply this rationale here would be to adopt a somewhat crabbed view of the purpose of the RLA minor dispute procedures. The Court noted that "Injunctions against strikes, even temporary injunctions, very often permanently settle the issue," 428 U.S. at 412, 96 S.Ct. at 3150. Not enjoining a sympathy strike may also, however, settle an issue for all practical purposes. Thus, in some cases, if any meaningful relief is to be available, limited pre-arbitration judicial intervention will be necessary where the employer can show a strong likelihood of ultimately prevailing in its interpretation of the clause and the inadequacy of other remedies. In the RLA context we must take the risk of making this determination in order to make the statutory mechanism work
 
 
 [13]
 We emphasize that where, as is true in this case, the employer's likelihood of ultimately prevailing depends in large measure on construction of the parties' bargaining agreement, the district judge should be satisfied that the sympathy strike clearly violates the no-strike clause or a controlling provision of the RLA
 In light of our disposition, it is unnecessary for us to consider in detail TIA's argument that regardless of any contract provisions, all sympathy strikes may be enjoined as violating policies expressed in the RLA. See Chicago & Illinois Midland Ry. v. Brotherhood of Railroad Trainmen, 315 F.2d 771 (7th Cir.), vacated as moot, 375 U.S. 18, 84 S.Ct. 61, 11 L.Ed.2d 39 (1963). Compare Brotherhood of Railroad Trainmen v. Atlantic Coast Line R. R., 362 F.2d 649 (5th Cir.), aff'd by an equally divided court, 385 U.S. 20, 87 S.Ct. 226, 17 L.Ed.2d 20 (1966); Brotherhood of Locomotive Firemen and Enginemen v. Florida East Coast Ry., 346 F.2d 673 (5th Cir. 1965).
 
 
 [14]
 See note 9, supra. We doubt, however, that the primary strike in this case was "legal" as the word was used in subsection E of the agreement. Further, TIA argues the clause applies only to individual, not concerted, refusals to cross legal picket lines
 
 
 [15]
 We recognize the theoretical possibility that the combination of our holdings regarding enjoinability of the primary and sympathy strike might lead employers to take curious actions. An employer seeking an injunction against a strike might attempt to argue that a clause which unambiguously prohibited the strike in question so that there was no minor dispute to be arbitrated was in fact unclear, so that minor dispute arbitration was necessary to determine its meaning and an injunction was appropriate pending such arbitration. We doubt that such behavior will be common, and we trust that the district courts are capable of disposing of any efforts to generate spurious minor disputes
 
 
 [1]
 The majority asserts that the injunction in Seaboard simply required the union to abide by its agreement to limit the scope of the section 6 proceeding, thereby enabling the parties to complete required bargaining on other subjects. The opinion in Seaboard, however, makes it clear that the moratorium agreement foreclosed bargaining on all subjects and that no section 6 proceeding was pending. Seaboard World Airlines, Inc. v. Transport Workers Union, 425 F.2d 1086, 1087-88 (2d Cir. 1970). Rather than clearing the path for relevant negotiations, the injunction in Seaboard foreclosed union efforts to compel any negotiations
 
 
 [2]
 The majority acknowledges that the strike issue here involved a minor dispute. I have found no relevant case deciding whether the post-contract setting of the dispute would preclude invocation of the mandatory arbitration procedures of the Act. It seems to me, however, that decisions requiring contractual arbitration in disputes over rights accrued under an expired agreement would be applicable to the statutory arbitration of the RLA. See, e. g., Nolde Brothers, Inc. v. Local 358, Bakery Workers, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977)
 
 
 [3]
 As in Seaboard, the contract provision in the case before us is quite clear on its face. The union does not appear to argue that the contract clause in question was not intended to forbid strikes against military flights even after impasse. Rather, it contends that even such clauses may be changed unilaterally by self help when the procedures of the Act have been exhausted. As in Seaboard, jurisdiction to determine the validity of a contract provision under the RLA is thus properly invoked
 
 
 [4]
 The majority contends that such a distinction between injunctions enforcing an arbitrator's decision and those in support of a judicial decision was adopted by the Supreme Court in Buffalo Forge. See ante at 965. The Court drew the distinction there because the policy supporting injunctive relief under the NLRA, encouragement of private agreements to arbitrate labor disputes, would be undermined by a decision granting courts authority to intrude on the exclusive jurisdiction of the arbitrator by preliminarily resolving the merits of a contract dispute. But the majority itself reaches a different result, and I concur, on the same sympathy-strike issue as presented in Buffalo Forge, on the ground that the statutory arbitration of the RLA involves a broader policy against prearbitration strikes. See ante at 966. The case more nearly on point, Seaboard, relies on this same broad RLA policy against strikes pending resolution of a minor dispute, and concludes that it also applies to questions of statutory construction properly pending before a court. My extension of this reasoning to injunctions supporting the eventual resolution of the statutory issue is supported by the later Second Circuit decision upholding the issuance of a permanent injunction in that case. Seaboard World Airlines, Inc. v. Transport Workers Union, 443 F.2d 437 (2d Cir. 1971)
 
 
 [5]
 Another possible distinction is that a second anomaly would have resulted if injunctive relief against the strike was denied in the setting of Seaboard. Section 6 of the RLA forbids unions from striking prior to the completion of the RLA's major dispute procedures, and injunctive relief may support this statutory duty. The refusal to enjoin the strike in Seaboard would thus have appeared to grant greater rights to a union which wrongfully demanded that the employer negotiate new terms than to one which appropriately invoked section 6. See Seaboard World Airlines, Inc. v. World Transport Workers Union, supra, 425 F.2d at 1091-92. Even so, the union in Seaboard was not seeking to impose bargaining terms prior to negotiating with the employer, but merely refusing to maintain the prior agreement not to reopen the contract for bargaining. Apart from the alleged breach of the duty to "maintain agreements," the union might well have contended that Norris-LaGuardia protected the use of economic pressure to convince the employer that changed circumstances required negotiation of new security provisions, notwithstanding such pressure was in breach of contract. It is significant that the court in Seaboard relied on the duty to "maintain agreements" rather than the status quo provision of section 6, the provision that serves to prevent the undermining of a section 6 proceeding by strike tactics
 
 
 [6]
 Cf. Buffalo Forge Co. v. United Steelworkers, AFL-CIO, supra, 428 U.S. at 410, 96 S.Ct. at 3149 (arguing that sympathy strike injunction necessarily implies judicial authority to "enjoin any other alleged breach of contract pending the exhaustion of the applicable grievance and arbitration provisions"). As Justice Stevens observed in dissent in Buffalo Forge, however, such an argument merely assumes that accommodation means repeal. See id. at 422-23 n. 11, 96 S.Ct. at 3154-55 (Stevens, J., dissenting)